the past and returned them to the issuing bank.

Bass said he had contacted Deana Curtis of Stewart Title and she told him the checks were valid. (4RT 760-61.)

Bass was in possession of a U.S. Bank statement which was in the name of Curtis Management Group. Frost reviewed the statement and noted that on December 31st 2002 there had been two deposits totaling $800,460.00. Bass said he did not know who deposited the money and the account had been closed after the bank suspected fraud. Bass had another document which was a list of persons to whom he had to wire money which he owed them.(4RT 763.)

Bass said he could get his hands on 5 million dollars but could not make the $10,000 bail. (4RT 764.) Bass said that Moore and Bellow knew his address, had him under surveillance and were threatening his life. (4RT 765.)

**Jeffrey Horner**

F.B.I. agent Jeffrey Horner was assigned to investigate the "deposit of a fraudulent check at the Rancho Santa Fe Bank December 5th of 2002." (4RT 797.) He got the case in April 2005. He brought it to the District Attorney's Office on August 18th 2005. He also participated in the arrest of

FBI PREVIOUSLY REJECTED CASE & REFERRED TO SDSO

appellant on December 14th 2005. He had an opportunity to sit in on an interview of appellant and prior to that interview he searched a vehicle "that Mr. Bass had gotten into prior to his arrest. " (4RT 7908.)

Horner found a fax cover sheet to Raymond Nola dated March 22, 2005. (4RT 800.) Horner heard Bass admit to Investigator Cargel that Bass has directed funds on 12/6/02 to be wired to New Zealand from Rancho Santa Fe National Bank. (4RT 803.) Bass described using a 5 year CD, for $30,000, as collateral to get a loan at 3% from the New Zealand Bank. That seemed unusual to Horner. (4RT 805.) Bass admitted writing the authorization for the wire transfers. (4RT 812.) He signed a statement that he wrote the wire instructions for $15,000 to Fifth Third Bank; $30,000 to Westpac Trust ; $80, 967 to Community First National; $75,000 to Union Bank of California all on 12/06/02 and that he withdrew $25,000 from Rancho Santa Fe National Bank account no. 01042467. Bass stipulated in open court that he wrote that statement. (4RT 813.)

He found a copy of the Bank Secrecy Act, also known as the Anti-Money Laundering Act in the trunk of the vehicle. (4RT 843.)

WHY IS THIS INCL & IMPORTANT?

**Joseph Cargel**

Cargel is an investigator for the San Diego District Attorney's Office.

(4RT 850.) He described the arrest of appellant in Encinitas in December 14, 2005 and then his interview for two hours and 20 minutes at the Central Jail. (4RT 850-51.)

Appellant identified the Clark County Credit Union check (People's Exh. 1) and told Cargel that the check had been sent to him by investors in his company called High Gear Athletics. The check was to be used to purchase equipment and get things started for his business. (4RT 853.) He also was going to use the money to get credit and invest some of the funds. The investors wanted $125,000 a year return on investment and that was later changed by Bass to $125,000 return every six months.

Appellant described Curtis Sports Management as a company that was going to consist of Sports Agents, Athletes, Trainers, Physical Therapists and other people working in the sports medicine type field. (4RT 854.)

Appellant told hm that High Gear Athletics was the parent company for Curtis Sports Management "or vice versa".

His business plan was posted on the Internet. (4RT 855.)

Appellant said he never met the investors face to face but provided them with detailed documents about his business. (4RT 856.)

Appellant said he did not know why the investors sent him a bogus check for $450,000. Appellant told Cargel he was suspicious about the check and called both Clark County Credit Union in Nevada and Rancho Santa Fe Bank to verify funds on the check. The Clark County employee told him the funds were available. She did not tell him it was a fraudulent check. (4RT 858-9.)

Appellant said he went to the Rancho Santa Fe Bank and asked the teller to verify the funds first. The teller told him the funds would be held for 24 hours.(4RT 859.)

Appellant told Cargel he gave Curtis Richmond $50,000 from the $450,000 check for a down payment on a house. Appellant expected Richmond to pay him back. (4Rt 860.)

When asked about the $30,000 wire to New Zealand at Westpac Trust, appellant gave a very confusing account of setting up a 5 year CD and then borrowing back 100% of it at a lower interest rate than earned by the CD. (4RT 861-2.)

They asked appellant about a wire of $80, 967 to Community First National Bank in Fargo North Dakota and appellant said he was just sending it where the investors told him. (4RT 863.)

Appellant admitted sending a wire of to Fifth third Bank in Naples Florida for operating expenses for a business partner in Curtis Sport Management. (4RT 863-64.)

He wired $75,000 to Jann Marie Morgan , a one-time girlfriend, at Union Bank of California, as a gift. People had taken advantage of her and he wanted to give her the money. (4RT 864-65.)

When asked if the investors would be upset at this use of money, appellant "shrugged it off and said, okay, what am I guilty of." (4RT 865.)

Appellant said he had assisted the Bank in recovering the money to Morgan. Her account had been frozen and all of the$75,000 had been recovered.

He said that Morgan would have paid him back by being a massage therapist working with appellant's clients.(4RT 866.)

Appellant said he had withdrawn $25,000 from the original $450,000 to pay personal bills. (4RT 867.)

Appellant told them he had been arrested in Costa Mesa for a "similar situation" (4RT 868.) Appellant had called the Escrow Company regarding the Costa Mesa check. (4RT869.)

Appellant did not have the name or address of the investors who sent

the fraudulent checks. They were going to contact him for repayment. (4RT 869-70.)

Appellant did not contact the police to report the fraud on him by the investors. (4RT 870.)

Appellant told him that he couldn't use the regular gyms to work as an independent contractor and therefore he was now working in the Risk Management field. (4RT 871.)

Appellant told him he was presently employed by a trust and was on his way to Europe when he was arrested. He had been working for this Trust for three or four months. He had been given a limited power of attorney and was going to a bank to "broker a deal" for the trust. (4RT 871-73.)

**Testimony of the Severed Counts 11and 12; Vehicle Code Section 10851subdivision (a) and Penal Code Section 496 Subdivision (A), Respectively.**

**Prosecution Case**

**Jeffrey Horner**

F.B. I. Agent Jeffrey Horner searched the vehicle Mr. Bass was in at the time of his arrest and retrieved documents in appellant's name with his address and dates into 2005. (6RT 1310–21.)

**Marlene Rose Kennedy**

Kennedy is unit manager for 9 locations of Budget Rent A Car. She has been with the company 12 years. She is familiar with the forms and business records of the company. (6Rt 1330-31.)

The 2000 Ford Explorer in which appellant was arrested came into the company inventory on February 18, 2004. By September 17, 2004 it had 16,900 miles on it.

Standard procedure is for the customer to produce a license and credit card and sign a rental agreement.

In the case of this particular Ford Explorer, it came into the lot "after hours", at 6:39 p.m. at the Carlsbad rental office on September 17, 2004. (6RT 1332-35.)

The car was put on a non-revenue transfer contract. That means no money was being paid for it and it was to be transferred to another rental location. (6RtT1335.)

This was not routine. The store was closed there would not be drivers to move the vehicle.

The car was supposed to be transferred to the San Diego Airport according to the non revenue ticket. It never showed up. "There was no

movement" of the car after Sept. 17, 2004 according to the records of Budget Rent A Car. The car was never returned to Budget. (6RT 1336-37.)

Ryan Frayzer was the employee for Budget who wrote the non-revenue ticket. After Sept 17, 2004[4] he was no longer working with the company. (6RT 1337-38.)

COULDN'T BE LOCATED!

She contacted Mr. Frayzer and he gave her a number to call, 858 361 6035. She was attempting to call Rob Curtis whose name was on the non-revenue ticket as an employee of Budget Rent A Car.

DIDN'T REMEMBER CALLING ON CROSS

She could not reach any one at that number and the loss prevention unit suggested "that we get the vehicle reported stolen." (6RT 1338-1440.) so.

She became aware the car had been recovered by law enforcement in December 2005.

Loss to Budget Rent A Car was as follows: Impound charges were $660, damage to the vehicle $600, loss of the use of the vehicle for 13 months was be approximately $16,000. With taxes the total was $18,

---

[4]On cross-exam she changed this date to September 26, 2004. (6RT 1350.)



WHERE IS CROSS-EX OF KENNEDY?

209.61. (6RT 1340-41.)

She directed someone to report the vehicle stolen since it was missing. Rob Curtis or Robert Curtis Bass did not have permission to have the vehicle from September 2004 through December 2005. (6RT 1342-43.)

**Joseph Cargel**

Cargel described his arrest of appellant on December 14, 2005 in Encinitas. Appellant had started the car when he was arrested on a felony warrant for grand theft. (6RT 1362-63.)

At the Central Jail interview, Bass told Cargel he had arranged to have his girlfriend rent the car in Carlsbad. He assisted his girlfriend in taking back the car.

He worked out a deal with the agent for another week for $200. He had a phone number for the agent and he was allowed to hold onto the vehicle for a period of time and told by the agent not to turn the vehicle back until he was contacted by the agent. The agent told him that it will be no big deal because the car was never put in the rental system. Mr. Bass made several attempts to get in touch with the agency but it was unable to do so and decided to continue driving the car. (6RT 1369-1370.)

Appellant decided at some point to drop the car off in December

2005 and leave a note and some money but he never did. (6RT 1371-73.)

Appellant admitted that he had a funny feeling about keeping the car and should have turned it in. (6RT 1376.)

He assumed the rental agent must still be in contact with the car rental office as he had a friend in a federal agency run a check on the car and it did not come back stolen. (6RT 1377.)

**Cross-Exam**

On the way to Central Jail, Cargel told Deputy Brunk that the vehicle was an unreported stolen and that it needed to be recovered. (6RT 1387.)

On December 7, 2005, Cargel took a stolen vehicle report from Ms. Kennedy of Budget but did not enter the vehicle into the stolen vehicle system. (6RT 1388-89.)

WHERE IS THE REPORT?

Cargel instructed Deputy Brunk to enter the vehicle into the stolen vehicle system and then remove it, all on the day of the arrest of appellant, December 14, 2005. Cargel said that this was the proper procedure for entering an unreported stolen vehicle into the system and then removing it after recovery. (6Rt 1390-91.)

The Prosecution rested. (6RT 1392.)

## I. APPELLANT BASS WAS DENIED FEDERAL DUE PROCESS UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS WHEN THE TRIAL JUDGE DENIED HIM A CONTINUANCE AFTER GRANTING HIM HIS *PRO-PER* RIGHTS.

### A. Factual Background

Mr. Bass was arrested on December 14, 2005. He was appointed counsel on December 16, 2005. (1CT 109.) The preliminary examination was set for December 30, 2005. On that date, the preliminary exam was continued at the request of defense counsel over the objection of appellant Bass. (1CT 111.)

After the preliminary examination, appellant Bass, was arraigned on the information, the people's motion to dismiss counts seven through ten and thirteen and fourteen was granted. Bass requested "legal counsel" and the Judge commenced a *Marsden* hearing which was denied along with appellant's request for pro per status. (1CT 113.)

On March 7, 2006, Bass and his lawyer appeared before Judge Danielsen who noted that a previous *pro per* request had been denied (March 7 transcript 1ART p.1)

Bass explained to the court he had completed a *Lopez* waiver form.

The court asked why self-representation was denied. Appellant's lawyer explained it was denied because the judge wanted appellant's lawyer to read the discovery and speak more with his client. Bass still objected to the denial of the motion for self-representation.

The court asked Bass what he wanted to do now and Bass said he wanted "newly appointed counsel." (March 7 transcript 1ART4)

At the *Marsden* hearing, appellant Bass said that Mr. Tandon had not even read the discovery yet but recommended that Bass take the 16 month offer from the prosecutor and plead guilty. Ultimately, the judge denied the *Marsden* motion. (March 7 transcript 1A ART p.21.)

Appellant Bass withdrew his request for self-representation. (March 7 transcript 1ART p.24)

A time waiver was taken and trial set for April 3, 2006. (March 7 transcript 1ART p.24.)

On April 3, 2006 the case was sent to Judge Krauel for trial and appellant Bass again made a *Marsden* motion.

Bass said that his attorney had said Bass was "nothing but a liar and a con artist." (Vol 2A *Marsden* Hearing of April 3, 2006, p. 206.)

Appellant Bass stated again in closing, " And the comment he made

to me that I'm a nobody, I'm just a liar and a con artist. I can't be represented by counsel who has that opinion of me." ( *Id.* at p. 212.)

Defense counsel responded that appellant had "wished a brain tumor on me at some point in time so that I could be relieved off the case." Defense counsel also admitted that he did call him a con artist and a liar at that point in time. I think that was out of frustration and probably an error for me to do so, but that is truthful what he said. (*Id.* at p. 215.)

The court denied the *Marsden* motion and then appellant asked that he be allowed to represent himself. The court responded that appellant Bass would have to go to trial that day and there would be no continuance. Appellant stated he was not ready to go to trial and would need a continuance. (*Id.* at pp. 221-223.)

Defense counsel asked to talk to appellant and when they came back on the record defense counsel stated that appellant was withdrawing his request for self-representation. Appellant was never asked by the judge if those were his wishes but moved on to the next subject which was severance of counts 10 and 11 dealing with auto theft from the case.(2RT 224.) That completed the morning session.

At the start of the afternoon session, the judge stated he had been

given a form acknowledging the right of self-representation filled out by Mr.Bass. In the process of going over the waiver of right to counsel. The judge asked appellant:

| | |
|---|---|
| The Court: | And why are you requesting to represent yourself? |
| The Defendant: | Mr. Tandon said I would lose with him for certain. |
| The Court: | Do you think you would lose with another lawyer? |
| The Defendant: | I don't think so. |
| The Court: | And why is that? |
| Mr. Tandon: | Your Honor, I'm going to ask that Mr. Bass not answer that question because that's getting into specifics of his case at this point. |
| The Defendant: | Your Honor– |
| Mr. Tandon: | That's my advice to Mr. Bass |

(2RT 241.)

The judge went on to state the trial would not be delayed and accepted the "petition" to proceed in *pro per*. (2RT 242.)

Mr. Tandon put on the record that he was handing to appellant Bass, the witness list from the D.A., the amended information, and some pages of discovery that he himself had received that morning. A recess was taken while the discovery to be given to appellant was redacted of confidential information and copied. (2RT 243.)

Appellant Bass then made a motion for a continuance.

The judge responded that the decision to represent himself was a result of Bass' "sour grapes" that he had not succeeded with his *Marsden*

motion. He said further: "I don't see any basis for continuing this matter. You have what you have. If there are other documents, we can get them to you. There won't be any evidence presented today." (2RT 245.)

The prosecutor stated: "Well, your Honor, I think Mr. Tandon was going to provide the defendant with a copy of redacted discovery that he had received prior to today. I'll confirm that with Mr. Tandon. And if I don't hear otherwise, I'll have a copy of redacted discovery available for the defendant tomorrow morning.(2RT 247.) The judge responded that they could pick a jury in the morning and proceed that way but the prosecutor prevailed on the judge to start jury selection immediately as she had already made arrangements for her witnesses, some of whom had been flown there. She said Mr. Bass "does not need discovery to pick a jury. And he apparently is very familiar with his case to the extent that he feels confident he can represent himself. I can have a copy of discovery for him tomorrow morning." The judge said, "I think that's the best we can do." (2RT 247.)

Mr. Bass then raised the jurisdictional issue of the charges from the Orange County bank (Comerica), moving to dismiss those charges. The judge deferred ruling on that motion and told Mr. Bass he could object

when the evidence came in. (2RT 248.) The jury panel was then voir-dired and sworn in at 3:30 that afternoon. (2RT 249.)

**B. Appellant Bass Was Denied Federal Due Process When the Trial Judge Denied Him A Continuance After Granting Him His *Pro-Per* Rights.**

"In determining whether a denial was so arbitrary as to deny due process, the appellate court looks to the circumstances of each case and to the reasons presented for the request. [Citations.] One factor to consider is whether a continuance would be useful." (*People v. Frye* (1998) 18 Cal.4th 894.)

It was patently unreasonable and a denial of federal Due Process to expect Mr. Bass to start his trial immediately after being granted his right to self-representation, even a lawyer would need more time.

A defendant in a state criminal trial has a constitutional right, under the 6th and 14th Amendments, to represent himself when he elects so to do. (*Faretta v. California* (1975) 422 U.S. 806, 819, (*Faretta*).)

"To invoke the constitutionally mandated unconditional right of self-representation a defendant in a criminal trial should make an unequivocal assertion of that right within a reasonable time prior to the commencement of trial." (*People v. Windham* (1977) 19 Cal.3d 121 .)

When a defendant makes an untimely *Faretta* motion, the court may deny it. (See *People v. Gallego* (1990) 52 Cal.3d 115, 163-164; *People v. Hill* (1983) 148 Cal. App. 3d 744, 757 .) When defendant's untimely motion is brought for delay, the trial court should deny it. (*People v. Morgan* (1980) 101 Cal. App. 3d 523, 530-531.) There is no doubt that the trial judge could have properly denied appellant's *Faretta* motion which was made on the heels of a denial of appellant's *Marsden* motion on the day of trial but the trial judge granted the motion for self-representation.

Once a defendant's motion for self-representation is granted, "he must be given, if he requires it, as much time to prepare for trial as an attorney; and if a reasonable continuance is necessary for this purpose, it must be granted upon timely request. To deny him that opportunity would be to render his right to appear in *propria persona* an empty formality, and in effect deny him the right to counsel." (*People v. Maddox* (1967) 67 Cal.2d 647, 652-653.)

It appeared that the trial judge was going to give appellant until the following morning before the jury selection began until the prosecutor prevailed on the judge to start jury selection immediately based on the convenience of her witnesses. Her argument for immediate

commencement of the trial was based on the assertion, apparently agreed with by the trial judge (2RT 247) , that discovery was not required by appellant for jury selection. How many criminal defense attorneys would agree with that premise?

Appellant was provided the morning after jury selection with, as stated by the prosecutor, "pages 01 through 0787; a copy of a CD, copy of the defendant's interview; and a copy of the preliminary hearing transcript [124 pages.] And yesterday the defendant was provided with pages 788 through 798. So that is the discovery to date." (3RT 401.)

Appellant was asked to respond by the judge and said: "I have received all of this. I haven't had a chance to look through it, but it appears to be that."(*Id.*)

After some plea negotiations and an attempt by appellant to waive jury which was not accepted by the District Attorney's Office, he asked for a continuance. He said "I am not prepared. I just got the discovery this morning. It was just handed to me a half hour ago." The prosecutor pointed out that appellant had said "he had been living with this particular situation for months–and it may not have been during the motion, but at some point in time yesterday morning, he said he had been living with this case for

months and felt prepared to go forward." The judge denied the motion for continuance. (3RT 414-415.) Immediately following this denial, the jury waiver was accepted by the prosecution and a few minutes later the first witness was called and the taking of evidence commenced. (3RT 420.)

There is a large body of California case law which would agree that, under these facts, reversal of all of appellant's convictions is required.

The leading case on this issue is *People v. Fulton* (1979) 92 Cal.App. 3d 972. There, defendant Fulton's case was trailing for trial when the judge granted Fulton's motion for self-representation but appointed the former attorney to act as advisory counsel. The case again trailed after this point and when it came to trial, Fulton " sought a 30-day continuance on the ground that he had not had time, due to the lateness in getting *pro per* privileges and a copy of the preliminary transcript, to prepare for trial." (*Fulton* at pp. 975-56.) The court in reversing due to failure to grant a continuance held:

> While it is now settled that a trial court may deny a request for self-representation made on the very eve of trial, on the ground that granting the motion would involve a continuance for preparation, the very rationale of that doctrine requires that, if the trial court, in its discretion, determines to grant the request for self-representation it must then grant a reasonable continuance for preparation by the defendant. (Citation.)

(*Fulton* at p. 976.)

Even the fact that Fulton had advisory counsel did not detract from Fulton's need for "reasonable time to prepare himself to seek or receive advice." (*Ibid.*)

In *People v. Wilkins* (1990) 225 Cal. App. 3d 299, the defendant made a *Faretta* request on the date trial was scheduled to begin. When the defendant made his *Faretta* motion, the trial court informed him it would not grant a continuance. The court granted the self-representation request. A few days later the defendant unsuccessfully moved to continue, stating he needed time to prepare his defense and that his *in propria persona* privileges had not yet been implemented. On appeal, the court held that the denial of the continuance had violated the defendant's rights to counsel and due process, and was reversible error *per se*. It rejected arguments that the defendant had waived his right to a continuance, holding that a defendant cannot be forced to give up one constitutionally protected right to obtain another. (*Id.* at pp. 307-308.)

In *People v. Hill* (1983) 148 Cal. App. 3d 744, over the course of several months the defendant vacillated between representation by several different attorneys and self-representation. Before the trial court granted his

eventual Faretta motion, it informed him that it would not grant a continuance if it allowed him to represent himself. The defendant's subsequent motion for a continuance was denied. On appeal, the court held that while the trial court could have denied the *Faretta* request as untimely, once self-representation was granted, the trial court was required to grant the defendant's request for a continuance. (*Id.* at p. 757.) It reasoned, " 'While it is now settled that a trial court may deny a request for self-representation made on the very eve of trial, on the ground that granting the motion would involve a continuance for preparation, the very rationale of that doctrine requires that, if the trial court, in its discretion, determines to grant the request for self-representation it must then grant a reasonable continuance for preparation by the defendant. [Citation.]' . . . While the disposition of an untimely pro. per. motion is discretionary, the disposition of a request for continuance following the grant of such a motion is not . . . ." (*Ibid.*)

Appellant Bass was forced to choose between representing himself while unprepared or proceeding with appointed counsel in whom he placed no trust.

Bass did not get his *pro per* privileges put into the jail computer for the

first four days of the trial therefore he could not make phone calls.PCC was not informed of his pro per status for four days. (7RT 1502.) He did not have a runner, he did not have an investigator, he got back to the jail too late after being in court all day to make phone calls or go to the library.(4RT 904.) He did not get a runner and an investigator appointed him until the fourth day of what was a five and one half day trial. (6RT 1407.)

He was still getting discovery from the prosecutor on the fourth day of the trial. (4RT1001-1004.) Bass was in an impossible situation.

When the trial judge allowed Bass to represent himself, and then refused a continuance to allow Bass to prepare himself for that task, Bass was effectively denied counsel in violation of the Sixth Amendment. This was structural error and is reversible *per se*.

## II. APPELLANT WAS DENIED HIS STATUTORY RIGHT TO AT LEAST A FIVE DAY CONTINUANCE UNDER SECTION 1049 OF THE PENAL CODE.

Penal Code section 1049 provides: " After his plea, the defendant is entitled to at least five days to prepare for trial."

Here appellant Bass entered his plea to the amended information on the morning of trial, April 3, 2006. (2RT 233.) Statutorily he had the right to

a five day continuance under section 1049. The court could not abrogate that statutory right by conditioning the granting of *Faretta* rights on the giving up of a continuance.

A similar situation was faced by the defendant in *Wilkins, supra.*

There the case trailed for four of the statutory 5 days but Wilkins had no help of a runner or investigator as a pro per. The *Wilkins* court citing from *Maddox, supra,* held:

> "In short, just as a defendant may not be brought to trial too late [citations], he may also not be brought to trial too soon, i.e., without adequate opportunity for preparation of his defense. [Citations.] Implementing this rule, the Legislature has provided that 'After his plea, the defendant is entitled to at least five days to prepare for trial.' ( Pen. Code, section 1049.) A violation of this statute is not just a procedural deficiency, but an error of constitutional dimensions: 'forcing petitioner to trial in less than the minimum time provided by statute to prepare a defense, despite requests for a continuance, resulted in a denial of due process of law.' ( In re Newbern (1960) 53 Cal.2d 786, 791 [3 Cal.Rptr. 364, 350 P.2d 116].)
>
> "These principles are equally applicable to a defendant who competently elects to serve as his own attorney. It is true that such a defendant 'is not entitled either to privileges and indulgences not accorded attorneys or to privileges and indulgences not accorded defendants who are represented by counsel.' [Citation.] But neither is he entitled to less consideration than such persons. In particular he must be given, if he requires it, as much time to prepare for trial as an attorney; and if a reasonable continuance is necessary for this purpose, it must be granted upon timely request. To deny him that opportunity would be to render his right to appear in propria

> persona an empty formality, and in effect deny him the right to counsel." (67 Cal.2d at pp. 652-653.) (Italics in original.)

*Wilkins, supra,* at p. 305, 308-309.)

Here, appellant was not given any continuance whatsoever after he received for the first time voluminous discovery in his case and was then told he would immediately finish picking a jury and hear testimony from the first witness against him . No attorney would be placed in that position, nor should he or she. A continuance of at least 30 days would be given an attorney. Appellant had a five day continuance mandated by statute and that was denied him.

## III. WHEN THE TRIAL JUDGE DEEMED THAT APPELLANT HAD RESTED AND REFUSED TO GRANT A CONTINUANCE TO ALLOW APPELLANT TO PUT ON HIS CASE, HE DENIED APPELLANT HIS SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO PUT ON A DEFENSE.

### A. Preliminary Statement

This issue is related to the previously set forth argument re the failure of the judge to grant a continuance after allowing appellant to represent himself.

It is set forth separately to show just how prejudicial that denial of a continuance was since *per se* reversal tends to cover up prejudice as it does not assess it. There **was** an enormous amount of prejudice accruing to appellant Bass due to the failure of the judge to continue the trial; in a word, he was rendered defenseless in violation of the Sixth and Fourteenth Amendments.

**B. Factual Background**

Wednesday, April 5, 2006, had Cindy Ybarra from Comerica Bank, Julian Frost of the Costa Mesa Police Department, Jeffrey Horner of the FBI and Joseph Cargel, D.A. Investigator, all testifying for the prosecution.

At the end of the day, after testifying ceased, the judge stated that Mr. Bass wanted to listen to the tape of his interview by the witness who had already testified. The prosecutor explained that the CD player had been in the courtroom that morning and she later realized it could not play the WAV[5] file on the CD of the interview. (4RT 903.) She said she had a DA laptop he could use but was "not willing to give him our laptop."

Mr. Bass had a "simple solution". He said he knew the judge was

[5]WAV (or WAVE), short for Waveform audio format, is a Microsoft and IBM audio file format standard for storing high quality audio on PCs.(Wikipedia Internet Dictionary.)

against continuances (4RT 903-04) but "If I can be given a day so that I could go to the law library that has computers that can actually play a WAV file on the computer, and I can listen to it a the law library while I'm at Central. I have not had a chance to go to the law library because I have had court for the past three days, morning all the way through the afternoon; and by the time I am done, the law library was closed. (4RT 904.) The bailiff jumped in at this point and said that 1) the CD could not be taken back to the jail and 2)there was no guaranteed computer access at the law library. The judge told Bass that the bailiff would see if the disk could "go along" in a way that Bass would have access to it. He said further that he was not against continuances but only against those continuances for which there was no "good cause" and there was no good cause for a continuance. (4RT 904-905.)

On Thursday, April 6, the fourth day of what would turn out to be a five and one half day trial, the prosecutor started the morning session saying that Mr. Bass had complained he had not received pages 123 through 126 of the discovery and she was providing him those pages that morning. She had heard there was a problem with playing the CD.

The judge answered that he had tried it in three different modes and

only gotten static through the entire disk. The judge suggested it be played for Mr. Bass at the lunch hour with the DA's laptop. The prosecutor said it was a 2 hour interview and maybe Mr. Bass should listen to it first and the trial resume in the afternoon with Mr. Bass cross-examining Mr. Cargel who was the officer conducting the interview on the CD. (4RT1001-1004.)

At the afternoon session, the judge asked Mr. Bass if he was ready for cross-examination of Mr. Cargel and Bass declined. (5RT 1004.)

Bass requested a continuance to question Cargel at a later date due to information on the transcript and CD he had gleaned during the lunch-hour listening. The judge asked Bass how long he had the transcript and Bass responded, "yesterday". Bass stated there were discrepancies between what was on the transcript and what was on the audiotape he had just heard.

The prosecutor agreed that the "transcript is not a perfect rendition of what is on the audiotape" but the transcript was not evidence and she opposed any continuance. (5RT 1005-6.)

The judge wanted to know when the transcript was first made available, not to Bass, the judge knew that had been just the day before, but to the "Defense". The prosecutor said since December 27th 2005.

Bass responded that he made "more than half a dozen requests" from previous defense counsel for complete discovery but did not get the transcript til yesterday and the CD until today. He reiterated his need for a continuance. (5RT 1007-8.) He stated further that he needed to have an investigator assigned to him "to look into these matters" and Bass needed to "review the information and make whatever type of motions that I feel are necessary to my defense." (5RT 1008.)

The judge reminded appellant Bass that "when we were discussing your motion to represent yourself, I told you that you had to be prepared to go forward?" The judge said he backed away from that "just a little bit" to allow him to use the courtroom to better prepare yourself to cross-examine this important witness." But that did not mean the judge was going to continue the case any further. The judge went on to state that "when you decided to represent yourself, you *stepped into the shoes of the attorney at that point with the status of the discovery was (sic) made available to you in December*....(5RT 1009 emphasis added.)

Appellant Bass responded that he needed a continuance "so I can be assigned an investigator and runner?" The judge asked if Bass had applied to Department 11 and Bass said he had submitted a request at the Central

Jail and had yet to get a response. Bass also requested that the subpoenas he had fille out be submitted. (5RT 1010.)

Bass again asked for a continuance and an investigator and runner to help him file appropriate motions. He specifically mentioned a motion for illegal search and seizure of the contents of the vehicle. (5RT 1054-55.)

Bass again stated he wanted a hearing on suppression but he again was met with the untimeliness of that motion. (5RT 1059-60.) Earlier he had asked for a continuance so he could file a motion to suppress. (4RT 889.)

The judge, on late Thursday, approved five of appellant's subpoenas (5RT 1096) and then, with the authority conferred upon him by Department 11, appointed an investigator and runner to assist Mr. Bass. (5RT 1098.) The judge said it was his intention to put the case over until the following Wednesday morning as to Counts 1 through 10 and commence the following day, Friday, with the severed counts dealing with car theft and receiving stolen property. (5RT 1103-1104.)

The prosecutor was to commence her case Friday morning and the judge told appellant to have his witness relating to *that* trial to be contacted and ready. Mr. Bass responded: "the problem is, your Honor, by the time I

get back to–The court: Mr Bass, I understand the problems. I understand this is going to be very difficult to do....We are in this circumstance...as a consequence of becoming your own lawyer at the beginning of this trial, which was Monday, we're in the circumstances we are in. Do the best you can." (5RT1105.) Bass stated " I need to have a continuance, And I am not trying to delay the trial or delay this case or prolong anything out." (5RT 1106.)

The request was denied, the car theft part of the trial commenced on Friday, the next morning at 9:00 a.m. (Id.)

At the end of the prosecution's case on Friday, as to Counts 11 and 12, car theft and receiving stolen property, the judge asked appellant if he were going to testify. Bass responded that he had just spoken to the investigator "today" and he needed to get a continuance. The judge said theat he would hear the motion to continue at 1:30. (6RT 1394.)

In the afternoon session, appellant asked for a one week continuance "until the subpoenas have been issued for the witnesses for this particular case have been served and I can get notified from the investigator that they will appear." (6RT 1394-95.)

The judge denied the motion to continue. (6RT 1399.)

The prosecutor rested.

The judge turned to appellant to "look at the motions on file." Mr. Bass stated:

> Well, I haven't had a chance to prepare motions because I was just assigned the investigator, and I haven't met the PCC runner to obtain the proper documents to file those motions. And that's why I wanted to have a continuance, to prepare those motions and present them to the court in legal format, and I haven't had a chance to do that. I have been at court every day from the morning to the afternoon, and I just discovered yesterday that information was not entered into the computer that I was pro per. My status was not pro per and I just learned that yesterday. So I have been denied access to any documentation, any information since I have come to trial.

(6RT 1407.)

Bass again pointed out that his status as a pro per was not in the jail computer system and he could make no calls or get pro per privileges. The judge responded to take it up with Department 11 and Bass answered he had no way to contact Department 11. The judge said that he had the services of an investigator and runner and Bass responded he only had the investigator's business card but could not telephone him as he had no access to a phone. The judge told appellant that the trial was finished with

respect to Counts 11 and 12 and for appellant to be ready to put on his defense to Counts one through ten on Wednesday afternoon. (6RT 1420.)

On Wednesday afternoon, appellant said he had not heard from his investigator who took the subpoenas appellant had drafted and he was unaware of a"any witnesses that may be made available today to appear in court on the defense's behalf. Bass said that he had prepared a request for continuance because of the "short notice". Appellant Bass stated that the court gave him permission to proceed in *pro per* on Monday, April 3, 2006 but "it did not become effective until Thursday April 7th of 2006. So PCC that was assigned to defense counsel just was not made aware that I needed assistance." Appellant also pointed out that under the "criminal code in issuing subpoenas, witnesses need anywhere between five and seven days to answer to a subpoena or basically state if they are going to show up or not." (7RT 1502.)

The prosecutor opposed any continuance because of "the fact that defendant has decided at the late stage to represent himself has put himself in his own predicament." (7RT 1504.) The motion to continue was denied. (7RT 1507.)

When asked to take the stand, Mr. Bass said he could not "at this

moment" as there were not witnesses in the courtroom for whom he had issued subpoenas. He said he only had Monday and Tuesday to get his witnesses subpoenaed for Wednesday and that was not enough time. (7RT 1509.)

When told he was not presenting a case, appellant said he would present a case with witnesses.(7RT 1511.) He said if there was not going to be a continuance he was moving for dismissal. (7RT 1512.)

Then the following occurred:

> The Court: Court deems that the defense has rested.
> Mr. Bass: No.
> The Court: People, any rebuttal?
> Ms. Khalil: No, your Honor.
> Mr. Bass: Your Honor, the defense does not rest.
> ..............
>
> The Court: The defense case is deemed completed.

(7RT 1513.)

**C. Applicable Law**

The Sixth Amendment is the basis of the right to present a defense:

Rights of the accused.

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and

> district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

What happened in this case was a total deprivation of appellant's right to put on a defense in contravention of the Sixth and Fourteenth Amendments of the United States Constitution and Article !, section 28, subdivision (d) of the California Constitution. [the State constitutional right to present all relevant evidence].

This writer could find no case remotely approaching this fact situation where a trial judge, in a court trial, refused to allow time for an in-custody defendant to properly prepare his case, and forced him to rest without presenting a defense.

In *Crane v. Kentucky* (1986) 476 U.S. 683, (Crane), a defendant was precluded from introducing any testimony about the physical and psychological environment in which his confession had been obtained, in order to prove the confession was unreliable. The Crane court concluded that the blanket exclusion of the proffered testimony about the circumstances of petitioner's confession deprived him of a fair trial.

In the instant case, the exclusion of the defense case was total due to

the fact that appellant was not able to even have his subpoenas served on his witnesses because he was given no time to do so by the trial judge.

The Supreme Court of California stated recently:

> It is certainly true that a defendant who is representing himself or herself may not be placed in the position of presenting a defense without access to a telephone, law library, runner, investigator, advisory counsel, or any means of developing a defense [citation], but this general proposition does not dictate the resources that must be available to defendants."

(*People v. Jenkins* (2000) 22 Cal.4th 900 at p. 1040.)

Yet, this is *exactly* the position appellant Bass was placed in for the first five days of a five and one half day trial. He had no telephone access, no library privileges, no runner, no investigator and he was in trial all day everyday from Monday through Friday of those five days.

He could not file pre-trial motions to suppress evidence of the search of his car or to demur to the Comerica counts (nine and ten) on the basis of improper venue. Appellant was deprived of his right to present a defense due to the rush to judgment which followed once his *Faretta* rights were granted. The rush to judgment continued even to sentencing which is next discussed.

## IV. THE TRIAL JUDGE ABUSED HIS DISCRETION BY REFUSING TO CONTINUE THE SENTENCING HEARING AND FAILED TO EXERCISE HIS DISCRETION TO APPOINT "PCC STANDBY COUNSEL".

### A. Factual Background

Appellant was convicted on April 12, 2006 and his sentencing hearing occurred on May 10, 2006.

He had filed a Motion to Continue and for appointment of standby counsel (8RT 1701.)

The prosecutor did not object to the appointment of standby counsel but did object to the continuance. (8RT 1702.)

Appellant stated he had sent letters to four persons to appear at sentencing in his support . The judge asked "How are character witnesses going to be relevant to the sentencing issues?" Appellant Bass stated they"are people who have known me for a long time" and that "two of them are actually federal law enforcement agents."

Appellant stated he needed the assistance of standby counsel because his investigator only had a cell phone and appellant could not make collect calls from the jail to a cell phone, his runner had told him he was very busy and he had only seen him once the past week. (8RT 1703.)

The judge told appellant his "character is not in issue . It's what the sentence ought to be." (8RT 1704.) The judge noted there was no statement in mitigation filed and concluded that the request for continuance was for purposes of delay and that was being denied as was the motion for standby counsel.(Id.)

**B. The Trial Judge Abused His Discretion By Failing To Grant A Continuance For Sentencing.**

It is well-established that sentencing is a critical stage of the proceedings at which the accused is constitutionally guaranteed the right to effective assistance of counsel. ( *In re Perez* (1966) 65 Cal.2d 224, 229-230.) The trial court possesses considerable discretion in ruling on motions for continuances because of its ability to assess the myriad of factors which must be balanced in determining whether such a request is justified. (See *Morris v. Slappy* (1983) 461 U.S. 1.)

Nonetheless there is no question here that the trial court abused the broad latitude accorded it when it refused to continue the sentencing hearing.

What happened here is that the judge, by denying the continuance, in the face of non-opposition by the prosecutor to advisory counsel, effectively denied appellant Bass the effective assistance of counsel he so

desperately needed in this case. Bass had filed no Statement in Mitigation and said that he could not communicate with his investigator who had a cell phone and therefore could not receive collect calls from the jail. Bass clearly was unprepared for his sentencing hearing and the remedy of advisory or standby counsel was deemed "not inappropriate" by the prosecutor.

Appellant was denied his character witnesses at the hearing. The judge answered this by saying that appellant's character had no relationship to his sentence. This statement does not reflect the law, since it is beyond dispute that a defendant's character is an element of sentencing, but it does reflect the rush to judgment which prevailed during appellant's trial. Predictably, it denied appellant Due Process and any chance at advisory or standby counsel.

**C. The Trial Judge Failed To Exercise His Discretion With Respect to The Appointment of Standby Counsel And If He Did Exercise Such Discretion, He Abused It.**

The judge never articulated why he disagreed with the prosecutor's statement that appointment of standby or advisory counsel was appropriate. He simply made it impossible to have counsel by denying the continuance and by proceeding directly to sentence appellant.

As with other matters requiring the exercise of discretion, "as long as there exists a reasonable or even fairly debatable justification, under the law, for the action taken, such action will not be here set aside ... [Citations.]" (*People v. Crandell*, (1988) 46 Cal.3d 833, 863, internal quotation marks omitted.)

Here, appellant Bass, because of being given absolutely no time to prepare, had difficulty representing himself during the entire trial. He articulated his inability to get help in serving his subpoenas and filing his motions. At no time did an investigator ever appear in court with him and appellant pointed out at the sentencing hearing that he was alone at that hearing with no investigator or runner present and needed help. (8RT 1703.)

No continuance had been granted appellant before, and the record showed that appellant had even objected to the continuance of his preliminary hearing (1CT 111) so there was no support for the judge's conclusion the request for continuance/counsel was to delay the proceedings.

It was clear that appellant only wanted advisory counsel to assist him in having a meaningful sentencing hearing and not to delay the

proceedings.

In the face of no opposition from the prosecutor to the appointment of standby/advisory counsel, and with the showing by appellant that he needed help in preparing for a meaningful sentencing hearing, there was no reason to justify the court's denial of appellant's request.

## V. APPELLANT COULD NOT BE CONVICTED BOTH OF STEALING THE AUTO UNDER SECTION 10851 AND RECEIVING THE SAME STOLEN CAR UNDER SECTION 496.

Appellant Bass asserts that his conviction of theft of a vehicle bars his conviction for receiving a stolen vehicle.

Penal Code section 496, subdivision (a), states it is unlawful for every "person who buys or receives any property that has been stolen....knowing the property to be so stolen or obtained ... "

Vehicle Code section 10851, subdivision (a), states it is unlawful for "[a]ny person [to] drive or take a vehicle not his . . . own, without the consent of the owner thereof, and with intent either to permanently or temporarily deprive the owner thereof of . . . title to or possession of the vehicle, whether with or without intent to steal the vehicle . . . ."

Vehicle Code section 10851, subdivision (a), prohibits a wide range of

conduct and makes it unlawful to either take a vehicle with the intent to steal it **or** drive a vehicle with the intent to temporarily deprive its owner of possession. (*People v. Garza* (2005) 35 Cal.4th 866, 876 (Garza).)

In *Garza*, *supra,* 35 Cal.4th at page 871, the California Supreme Court addressed the interplay between Vehicle Code section 10851, subdivision (a), and Penal Code section 496 , subdivision (a).

The court stated the "common law . . . prohibits separate convictions for stealing and receiving the same property." (*Id.* at p. 874.) The court explained, "A person who violates [Vehicle Code] section 10851 subdivision (a) by taking a car with the intent to permanently deprive the owner of possession, and who is convicted of that offense ***on that basis,*** cannot also be convicted of receiving the same vehicle as stolen property. [Citations.] If, on the other hand, a section 10851 subdivision(a) conviction is based on ***post*** theft driving, a separate conviction under section 496, subdivision] (a) for receiving the same vehicle as stolen property is not precluded. [Citations.]" (*Id.* at p. 876 emphasis added.)

After concluding the trial court erroneously failed to instruct the jury sua sponte that it could not convict the defendant for both theft and receiving the same stolen property, the court stated it had to determine

whether it was reasonably probable that a properly instructed jury would have not convicted the defendant of violating both Vehicle Code section 10851, subdivision (a), and Penal Code section 496, subdivision (a). (*Garza*, supra, 35 Cal.4th at pp. 881-882.)

In the instant case, the prosecutor argued to the fact-finder that the taking of the car was illegal from the start. (7RT 1575, 1577.) The information also focused ***only*** on the date of the initial taking of the car, on or about September 27, 2004, in the charging allegation of Count 11 as to a violation of section 10851 of the Vehicle code.

On page 1578, the prosecutor, relying on the December 14th date of Count 12 and the fact appellant was arrested in the car on that date with the engine running (7RT 1578), argued that appellant possessed the car knowing it was stolen thereby supporting a conviction of receiving stolen property under section 496 subdivision (a).

Accordingly, the prosecution elected by the charging allegation and her argument to the finder of fact to attempt to convict appellant of the theft portion of section 10851, stealing the auto under section 10851, and was successful.

Since that was the case, based on *Garza, supra*, since appellant was

convicted of the theft component of section 10851 and not the post-theft component of that charge, the conviction of receiving stolen property must be reversed.

## VI. THE ISSUING OF THE WIRED FUNDS IN COUNTS THREE THROUGH EIGHT WAS ALL PART OF ONE OBJECTIVE INITIATED BY THE DEPOSIT OF THE BOGUS CHECK. ACCORDINGLY, SENTENCE SHOULD BE STAYED UNDER PENAL CODE SECTION 654 ON THOSE COUNTS.

Appellant was found guilty of Count One, fraudulently depositing a forged check for $450,000 into his account at Rancho Santa Fe National Bank. He additionally was found guilty of grand theft for each act of wiring sums from that same account to six different persons.

Under these circumstances, appellant Bass contends that the court violated the proscription against multiple punishment in section 654 by imposing sentences for grand theft for each of those wires alleged in Counts Three through Eight because those wires were simply a continuation of the original fraudulent deposit of the $450, 000 bogus check.

Section 654 provides, in relevant part, "(a) An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under

more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other." This provision "expressly prohibits multiple sentences where a single act violates more than one statute. For example, a defendant may be guilty of both arson and attempted murder for throwing gasoline into an inhabited room and lighting it, but the single act may be punished only once.

> "Section 654 also prohibits multiple sentences where the defendant commits different acts that violate different statutes but the acts comprise an indivisible course of conduct engaged in with a single intent and objective. [Citation.] 'If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' [Citation.] *Thus, in legal effect, different acts that violate different statutes merge under the perpetrator's single intent and objective and are treated as if they were a single act that violates more than one statute.*"

(*People v. Alvarado* (2001) 87 Cal.App.4th 178, 196, emphasis added.)

In *People v. Martin* (1962) 208 Cal. App. 2d 867, and *People v. Caruth* (1965) 237 Cal. App. 2d 401, each court held that although the defendant was properly convicted of issuing worthless checks and grand theft of a vehicle, he could not be separately punished for both offenses because issuing the checks was the means by which the defendant committed the grand theft.

Here, the deposit of the bogus check was the means by which the

appellant was able to wire out the money as set forth in Counts Three through Eight. Accordingly, the different acts violating different statutes merged under the single intent and they are to be "treated as it they were a single act that violates more than one statute." (*Alavarado, supra.*)

Accordingly, the sentences in Counts Three through Eight should be stayed under Penal Code section 654.

## CONCLUSION

The failure of the judge to grant appellant Bass a continuance after granting him his *pro per* rights under *Faretta, supra,* 422 U.S. 806, left him virtually helpless to defend himself. What happened is what is described below:

> But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated. As Judge Wyzanski has written: "While a criminal trial is not a game in which the participants are expected to enter the ring with a near match in skills, neither is it a sacrifice of unarmed prisoners to gladiators." *(Citation).*

(*United States v. Cronic* (1984) 466 U.S. 648 at p. 656-657.)

Appellant Bass, in custody , without a runner, without an investigator, without phone privileges, without library privileges and without discovery was indeed an unarmed prisoner in the ring with gladiators. Reversal of all his convictions is required.

Respectfully submitted,

Charles R. Khoury Jr.
Attorney for Robert Bass

## WORD COUNT CERTIFICATION

In accordance with Rule 33 subdivision (b), the text of APPELLANT'S OPENING BRIEF consists of 14,062 words as counted by the WordPerfect word processing program used to generate the brief.

Dated: December 27, 2006

CHARLES R. KHOURY JR.

People v. Bass D048678

DECLARATION OF SERVICE

The undersigned hereby declares the following:

I am a citizen of the United States over the age of eighteen years, and not a party to this action. My mailing address is Post Office box 1066,Wilton New Hampshire, 03086.

I served one copy of the attached APPELLANT'S OPENING BRIEF by placing a copy in a separate envelope, with proper postage, in the U.S. Mail, addressed as

Robert Bass F25881
Birch Hall 210
P.O. Box 441
Chino, CA
91708

Appellate Defenders
555 W. Beech St.
Suite 300
San Diego Calif. 92101

Attorney General
P.O. Box 85266
San Diego Calif.
92186-5266

Hon. Roger W. Krauel
Superior Court D-57
220 W. Broadway
San Diego Calif.
92101-3409

D.D.A. Fiona Khalil
330 W. Broadway .
San Diego Calif. 92101

I, declare under penalty of perjury under the laws of the State of California, the above statement is true. Executed at Wilton N.H. on December 28, 2006.

Charles R. KhouryJr.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
FOURTH APPELLATE DISTRICT, DIVISION ONE

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, | ) |
| | ) |
| Plaintiff and Respondent, | ) Court of Appeal No. |
| | ) |
| v. | ) D048678 |
| | ) |
| | )San Diego |
| | )County |
| ROBERT BASS | )SCD 195097 |
| | ) |
| | ) |
| Defendant and Appellant. | ) |
| | ) |

APPEAL FROM A JUDGMENT OF THE SUPERIOR COURT

COUNTY OF SAN DIEGO, STATE OF CALIFORNIA

APPELLANT'S REPLY BRIEF

Honorable, ROGER W. KRAUEL, Judge

Charles R. Khoury Jr.
Attorney for Appellant
P.O. Box 1066
Wilton N.H. 03086
(603) 654-2050
State Bar No. 42625
By Appointment of the
Court of Appeal under the
Appellate Defenders
Independent Case System

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
FOURTH APPELLATE DISTRICT, DIVISION ONE

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, | ) |
| | ) |
| Plaintiff and Respondent, | ) Court of Appeal No. |
| | ) |
| v. | ) D048678 |
| | ) |
| | )San Diego |
| | )County |
| ROBERT BASS | )SCD 195097 |
| | ) |
| | ) |
| Defendant and Appellant. | ) |
| ________________________________________ | ) |

APPEAL FROM A JUDGMENT OF THE SUPERIOR COURT

COUNTY OF SAN DIEGO, STATE OF CALIFORNIA

APPELLANT'S REPLY BRIEF

Honorable, ROGER W. KRAUEL, Judge

Charles R. Khoury Jr.
Attorney for Appellant
P.O. Box 1066
Wilton N.H. 03086
(603) 654-2050
State Bar No. 42625
By Appointment of the
Court of Appeal under the
Appellate Defenders
Independent Case System