# EXHIBIT "A"

September 11, 2007, Filed

NOTICE: NOT TO BE PUBLISHED IN OFFICIAL REPORTS. CALIFORNIA RULES OF COURT, RULE 8.1115(a), PROHIBITS COURTS AND PARTIES FROM CITING OR RELYING ON OPINIONS NOT CERTIFIED FOR PUBLICATION OR ORDERED PUBLISHED, EXCEPT AS SPECIFIED BY RULE 8.1115(b). THIS OPINION HAS NOT BEEN CERTIFIED FOR PUBLICATION OR ORDERED PUBLISHED FOR THE PURPOSES OF RULE 8.1115.

PRIOR HISTORY: [*1]
APPEAL from a judgment of the Superior Court of San Diego County, No. SCD195097. Roger W. Krauel, Judge.

DISPOSITION: Reversed in part and affirmed in part.

CORE TERMS: continuance, self-representation, convicted, jury trial, driving, untimely, venue, sentencing, theft, grand theft, prosecutor's, sentence, waived, counts of grand theft, stolen car, request to represent, jury selection, sentencing hearing, checking account, midtrial, statutory right, advisory, abused, case law, nonjury trial, trial proceedings, theft convictions, stolen property, time to prepare, conditioning

JUDGES: IRION, J.; NARES, Acting P.J., McINTYRE, J. concurred.

OPINION BY: IRION

OPINION

After a nonjury trial, the trial court convicted Robert Bass of forgery (Pen. Code, [1] § 476), burglary (§ 459), six counts of grand theft of personal property (§ 487, subd. (a)), two counts of attempted grand theft of personal property (§§ 664/487, subd. (a)), unlawful taking and driving of a vehicle (Veh. Code, § 10851, subd. (a)), and receiving stolen property (§ 496.) The court sentenced Bass to an aggregate term of four years four months in prison.

FOOTNOTES

1 All statutory references are to the Penal Code unless otherwise specified.

Bass appeals, contending that the trial court: (i) abused its discretion in denying his request for a continuance immediately after granting Bass's day-of-trial request to represent himself, and by later declining Bass's request for a continuance to locate witnesses during the defense case; (ii) violated his statutory right to a five-day continuance after he was arraigned on an amended information; (iii) violated his right to a jury trial by failing to obtain a [*2] second jury trial waiver after Bass was arraigned on a second amended information; (iv) abused its discretion in denying Bass's request for a continuance of the sentencing proceedings; (v) improperly convicted Bass both of stealing a car and the unlawful receipt of that stolen car; and (vi) erroneously convicted Bass of six counts of grand theft instead of one single count, where each of the counts was part of a single criminal scheme.

We conclude that Bass is correct with respect to this last challenge -- the trial court should have rendered a verdict on only one count of grand theft based on Bass's single criminal scheme. We consequently remand the case for the trial court to vacate the erroneous convictions, and resentence Bass accordingly. As Bass will receive a new sentencing hearing on remand, we need not consider Bass's other challenge to his sentencing procedure -- that the trial court erred by not granting him a continuance prior to sentencing. We reject the balance of Bass's contentions.

FACTS

To evaluate Bass's numerous contentions, we first present the relevant facts. A separate summary is presented for each of the discrete criminal schemes for which Bass was convicted.

A. [*3] Counts 1 Through 8: Rancho Santa Fe Bank

On November 13, 2002, Bass opened a checking account and a money market account at Rancho Santa Fe Bank in the name of Curtis Sports Management Group. Bass was the sole person with "signing authorization" on the accounts. On December 5, Bass entered the bank and presented a check in the amount of $ 450,000 payable to Curtis Sports Management Group, which he had endorsed, for deposit into the checking account. The check purported to be drawn on the Clark

County Credit Union, "payable through Wells Fargo Bank." In fact, the check was counterfeit, and the check number was identical to a check issued earlier by Clark County Credit Union to Chase Manhattan Bank in the amount of $ 1,220.01 (count 1, forgery; count 2, burglary).

Despite doubts about the check's authenticity, Rancho Santa Fe Bank did not place a hold on the check, and the funds became available the next day. 2 As soon as the funds were made available, Bass faxed wire transfer instructions to the bank, which he confirmed in a subsequent phone call. The transfers Bass requested were executed by Rancho Santa Fe Bank, resulting in a $ 75,000 transfer to Union Bank for the account of Jann [*4] Marie Morgan (count 3); $ 15,000 to the Fifth Third Bank in Naples, Florida, for Curtis Sports Management (count 4); $ 80,967 to Community National Bank in Fargo, North Dakota, for GMG Motors, Inc. (count 5); and $ 30,000 to Glen Eden Bank in Auckland, New Zealand, for Raymond Nola (count 6). In addition to those transfers, on December 9, Bass received a cashier's check drawn against the checking account for $ 50,000, payable to F.I.M. Research Associates (count 7); withdrew $ 25,000 cash from the checking account (count 8); and had $ 25,000 transferred to the money market account.

FOOTNOTES

2 The supervisor whose obligation it was to verify the check resigned shortly after the check was processed.

On December 10, Wells Fargo informed Rancho Santa Fe Bank that the initial $ 450,000 check was counterfeit and Rancho Santa Fe Bank stopped all activity on the account. Bass subsequently faxed additional wire transfer requests to Rancho Santa Fe Bank, but the requests were not executed.

B. Counts 9 and 10: Comerica Bank

On January 28, 2003, Bass and another man entered the Comerica Bank in Costa Mesa, and approached customer service representative Cindy Ybarra. Bass presented two checks, one for $ 440,200 [*5] and one for $ 444,954.32, purportedly issued by Stewart Title of Sacramento, and asked to exchange them for a bank check for the combined amount. Ybarra thought the checks looked suspicious and, after excusing herself, phoned Stewart Title. A representative of Stewart Title confirmed that the checks were not authentic. The check numbers, in

fact, corresponded to Stewart Title checks issued as payment for title fees in the amounts of $ 18 and $ 40. A bank employee called the police.

During the delay in identifying the checks, the man who had accompanied Bass left the bank; Bass remained. Officer Julian Frost arrived in response to the call from the bank and arrested Bass. Bass admitted offering the checks in exchange for a valid bank check, and claimed to have received them from his business partner, Mr. Moore, who mailed them to him from Oakland.

C. Counts 11 and 12: Budget Rent-A-Car

After being released, Bass was later arrested for the Rancho Santa Fe Bank check forgery on December 14, 2005, by FBI Agent Jeffrey Horner. At the time of the arrest, Horner observed Bass get into and start a 2004 Ford Explorer. The authorities later determined that the Explorer was owned by Budget Rent-A-Car [*6] (Budget). Budget was unaware that Bass had the vehicle.

Budget records showed that the car had last been returned on September 17, 2004, to a rental location in Carlsbad after hours and then improperly placed on a "transfer contract," a description Budget uses when it intends to transfer rental vehicles from one rental location to another. The transfer contract provides that the car was to be delivered to Budget's San Diego Airport location. The car never arrived at the airport, and Budget had no record of Bass, or anyone else, having rented it after September 17.

When asked about the car, Bass told police that his girlfriend had rented the car from Budget and that he had accompanied her to drop the car off, and had then rented it for a week for $ 100. He stated that after the expiration of the first week, he met the rental agent in a coffee shop, where he rented the car for another week for $ 200, and was told to hold on to the car until contacted by the agent. Bass then kept the car until his arrest.

DISCUSSION

I

The Trial Court Did Not Abuse Its Discretion in Denying Bass's Pretrial and Midtrial Continuance Requests

Bass contends that the trial court abused its discretion by denying his [*7] request for a continuance following the court's ruling allowing him to represent himself, and again when Bass sought a midtrial continuance for the purpose of locating potential defense witnesses. We evaluate these contentions after setting forth the relevant procedural history.

A. Procedural History

On April 3, 2006, the day set for trial of his case, Bass requested a Marsden 3 hearing to present argument that he was entitled to substitute counsel. Bass had requested substitute counsel on at least two prior occasions, on January 30 and March 7, and the court had denied both requests. 4 At the hearing, Bass contended that his appointed counsel, Danesh Tandon, had refused to locate witnesses and evidence that could be helpful to the case, had called Bass "a liar and a con artist," and pressured him to plead guilty. After Tandon responded to Bass's statements and detailed his efforts to locate evidence and witnesses, the court denied the Marsden motion. Bass then sought to represent himself. The court stated that Bass could represent himself, but if he did, he would do so with the understanding that "you will be starting trial this afternoon with jury selection." Bass stated that he wanted [*8] to represent himself, but needed a continuance because he was "not ready." Tandon then requested a few minutes to advise Bass. After consulting with Tandon, Bass withdrew his request to represent himself.

FOOTNOTES

3 People v. Marsden (1970) 2 Cal.3d 118 (Marsden).

4 Bass does not challenge the court's rulings denying any of his requests for substitute counsel.

Later that day, after a successful defense motion to sever the auto theft charges and to exclude evidence of the auto theft in the trial on the bank theft charges, Bass again requested to represent himself at trial. The court then went over the implications of self-representation with Bass, including that he would "not be given any special help or treatment"; would have "limited access to books, funds, investigative assistance and a runner during the course of the trial"; that he could not appeal "on the ground that your representation was inadequate"; and that he would "have no right to . . . standby or advisory or cocounsel." Bass stated that he

understood, and despite his lack of legal training, emphasized he had had "the past 100 days to review [his case] and to look at some case law and criminal codes."

The court stated its "advice [*9] and recommendation" was that Bass "not waive [his] right to [an] attorney." The court also reemphasized that it would not allow the request for self-representation to "disrupt this trial; we're going to have the jury in here in about 30 or 40 minutes." Bass stated that he understood. Bass filled out, and submitted, a written waiver pursuant to People v. Lopez (1977) 71 Cal.App.3d 568, 572, a so-called "Lopez waiver," which expressly recognizes, among other things, that "self-representation is almost always unwise"; that "extra time for preparing the case for motions or for trial will not be granted"; and that "no special investigator will be assigned to provide assistance."

The prosecutor opined that Bass's request was motivated by a desire to delay the proceedings and that she "strenuously" opposed any delay, but would not object to Bass's self-representation because the "court has just indicated there would be no delay." The court then granted Bass's request to represent himself, and relieved Tandon of his appointment. After a break in the proceedings, Bass, no longer accompanied by counsel, immediately requested a continuance on the ground that he did not "have all of my discovery [*10] with me today" and was "missing pages from the discovery that were supposedly previously provided to me by the public defender."

The court denied the continuance motion. The court noted that it believed Bass had sought to represent himself because he was "disappointed or miffed that your Marsden motion was not granted," and emphasized, "I advised you that we weren't going to delay the process" and "that your request was not timely to represent yourself if it meant continuing the trial. So you had the opportunity of going forward with your lawyer or choosing to represent yourself with the understanding that we would be going forward today." The court added that no evidence would be presented that day, and if Bass was personally missing any pages of discovery previously provided to his counsel, they would be promptly provided. The prosecutor also informed the court that there were two witnesses flying into San Diego for trial the next day. The parties then proceeded with jury selection, but were unable to complete the process in the time remaining that day.

The next morning Bass informed the court that it was a "bit overwhelming for me sitting here in this seat to be representing myself," [*11] and inquired whether there was any plea offer outstanding. The prosecutor offered Bass the option to plead

guilty to two counts, with the balance dismissed and a stipulated sentence of two years. Bass rejected the offer. Bass then stated he would like to "waive a jury trial" because, "based on yesterday's selection process," he did not believe he could "pick a fair and impartial jury." Bass stated, "I would rather have the court hear the case and have the court decide instead of 12 people who may have personal issues." Bass then waived his right to a jury on all counts. The court asked if Bass would like the court to attempt to locate Bass's previous counsel, Tandon; Bass did not request that the court do so.

The case proceeded with the prosecution presenting its evidence to the court in a bench trial. Throughout the proceedings, Bass informed the court of various difficulties he was encountering in trying the case, difficulties that stemmed from his lack of legal training, last-minute decision to dismiss his court-appointed lawyer, and custodial status. The trial court provided short delays in the trial proceedings to allow Bass to review evidence, work on court filings, subpoena witnesses, [*12] and made the courtroom available to Bass to mitigate practical difficulties created by Bass's confinement. Ultimately, however, after delaying trial for a week to accommodate Bass's efforts to subpoena defense witnesses, the court deemed Bass to have rested his case, over his objection, when he was unable to present any witnesses.

B. Analysis

Bass acknowledges that his motion to represent himself was untimely, and consequently concedes "that the trial judge could have properly denied [his] Faretta motion." 5 He contends, however, that once the trial court granted the motion, it had no choice but to grant a continuance to allow him sufficient time to prepare for trial. We disagree.

FOOTNOTES

5 A defendant has a federal constitutional right to represent himself (see Faretta v. California (1975) 422 U.S. 806 (Faretta)), but to invoke that right he "must assert it 'within a reasonable time prior to the commencement of trial.' " (People v. Clark (1992) 3 Cal.4th 41, 98.) A trial court has the discretion to deny a request for self-representation that is untimely. (Ibid.)

In People v. Clark (1992) 3 Cal.4th 41 (Clark) and People v. Jenkins (2000) 22

Cal.4th 900 (Jenkins), both capital cases, 6 our high [*13] court explained that a trial court has discretion to grant a defendant's untimely request to represent himself on the condition that if the request is granted, there will be no delay in the proceedings. The court recognized the existence of case law suggesting that a continuance would normally be required in such circumstances, 7 but explained that this authority was not controlling where, as here, the "trial court made clear its intent to deny the Faretta motion as untimely if a continuance would be necessary," and "[t]he Faretta motion was ultimately granted only when defendant expressly represented he was able to proceed without a continuance." (Clark, at p. 110; Jenkins, at p. 1039 [reaffirming principle announced in Clark "sanction[ing] the trial court's decision to condition the granting of the right of self-representation on defendant's waiver of a continuance"].)

FOOTNOTES

6 The protections offered to defendants in death penalty cases are generally greater than those in noncapital cases as "it is generally necessary to protect more carefully the rights of a defendant who is charged with a capital crime." (Keenan v. Superior Court (1982) 31 Cal.3d 424, 431.)

7 Prior to the court's decisions [*14] in Jenkins and Clark, a number of courts had held or suggested that once a trial court grants an untimely motion for self-representation, it must then grant "a reasonable continuance for preparation by the defendant." (See People v. Fulton (1979) 92 Cal.App.3d 972, 976 ["While it is now settled that a trial court may deny a request for self-representation made on the very eve of trial, on the ground that granting the motion would involve a continuance for preparation, the very rationale of that doctrine requires that, if the trial court, in its discretion, determines to grant the request for self-representation it must then grant a reasonable continuance for preparation by the defendant"]; People v. Bigelow (1984) 37 Cal.3d 731, 741, fn. 3; see also People v. Wilkins (1990) 225 Cal.App.3d 299, 307 (Wilkins); People v. Hill (1983) 148 Cal.App.3d 744, 756.)

Bass argues that Jenkins and Clark are distinguishable on their facts because in those cases the request for self-representation was made "midtrial" and the defendants had significant time to prepare prior to the granting of their motions for self-representation. However, even if these factors were controlling, there is little separation [*15] between the instant facts and those of Jenkins and Clark. While Bass's request for self-representation was not made during trial proceedings, it was

made minutes before jury selection, a time that has been characterized by our Supreme Court as "midtrial" in this context. (See People v. Valdez (2004) 32 Cal.4th 73, 102-103 (Valdez) [analyzing Faretta request made "moments before jury selection was set to begin" as a "midtrial" motion under Clark].) Further, in making his request for self-representation, Bass represented to the court that he had had "the past 100 days to review [his case] and to look at some case law and criminal codes," thus implying that Bass, like the defendants in Jenkins and Clark had significant time to prepare. In any event, however, even if Bass were right to draw a factual distinction between the instant case and Jenkins and Clark, what cannot be denied is that those cases establish an underlying legal principle that, contrary to Bass's contention, there is no per se rule that a trial court must always grant a continuance after granting an untimely request for self-representation. Rather, the propriety of granting a continuance in such circumstances is committed [*16] to the trial court's discretion -- i.e., a fact-specific inquiry based on the "circumstances present in [the] case." (Jenkins, supra, 22 Cal.4th at p. 1039.)

This principle was reaffirmed most recently in Valdez where our Supreme Court held, in factual circumstances similar to those presented here, that a trial court acted within its discretion in responding to a defendant's Faretta motion made "moments before jury selection was set to begin" by conditioning the granting of the motion on the defendant's agreement that the trial would not be delayed. (Valdez, supra, 32 Cal.4th at pp. 102-103 ["the court acted within its discretion in concluding that defendant could represent himself only if he was ready to proceed to trial without delay"].) The high court reasoned, based on Clark and Jenkins, that the trial court's authority to deny the Faretta motion on the ground that it was untimely necessarily included the authority to condition the grant of the motion on the defendant's commitment that a grant of the motion would not result in delay. (Ibid.) While the defendant in Valdez ultimately chose not to pursue his Faretta request on the terms offered, it necessarily follows from the holding [*17] of Valdez (as well as the holdings of Clark and Jenkins) that if the trial court has the discretion to condition the grant of a Faretta motion on a defendant's commitment that there would be no resulting delay, the trial court also has the discretion to hold the defendant to that commitment once the motion is granted. (See Jenkins, supra, 22 Cal.4th at p. 1038 [rejecting challenge to trial court's denial of request for continuance during penalty phase of death penalty trial where "the court warned defendant that a request for a continuance would constitute a basis for denying his motion to represent himself, and defendant accepted pro se status on the understanding that no additional time would be granted"].) This is exactly what occurred in the instant case. 8

FOOTNOTES

8 Bass contends that Valdez, supra, 32 Cal.4th 73, 102-103 is distinguishable because in that case there was a "finding" that the Faretta request was only "a tactic made for purposes of delay." In fact, however, the comments made by the trial court in Valdez parallel those made by the trial court in the instant case. The trial court here found, at least implicitly, that Bass's motion was intended for delay by conditioning its [*18] granting of the motion on a commitment that there would be no delay, and ruled (as did the trial court in Valdez) that Bass's motion was not made in good faith but was made because Bass was "miffed" that his meritless "Marsden motion was not granted." Thus we find Bass's attempt to distinguish Valdez unconvincing.

Having granted Bass's Faretta motion on the express condition that no continuances would be permitted on the ground that Bass was unprepared to try the case, the trial court was permitted to hold Bass to his agreement, and its determination to do so is reviewable only for abuse of discretion. (See Valdez, supra, 32 Cal.4th at pp. 102-103; Jenkins, supra, 22 Cal.4th at p. 1039.) Here, Bass demonstrates no abuse of discretion.

After numerous pretrial hearings, including multiple Marsden hearings in which Bass raised the possibility of self-representation but did not ultimately seek to represent himself, Bass finally invoked his right to self-representation minutes before jury selection was to proceed. (Cf. People v. Dent (2003) 30 Cal.4th 213, 218 [request for self-representation is " 'waived unless defendants articulately and unmistakably demand to proceed pro se' "].) Then, [*19] immediately upon the dismissal of his court-appointed attorney, Bass moved for a continuance on the ground that he was not prepared for trial. Given the trial court's findings that Bass's appointed counsel was performing adequately, its repeated emphasis that there would be no delays were the Faretta motion granted, and Bass's immediate request for a continuance of the proceedings upon the granting of his motion, we see no abuse of discretion in the trial court's actions. The court was simply holding Bass to his commitment, made moments before, that a grant of his Faretta motion would not result in a continuance of the trial. (Valdez, supra, 32 Cal.4th at pp. 102-103; Clark, supra, 3 Cal.4th at p. 110.) Consequently, we reject Bass's contention that the judgment must be reversed because the trial court did not grant his initial request for a continuance immediately after he elected to represent himself.

We also reject Bass's related contention that the trial court abused its discretion in denying his later request for more time to procure the attendance of defense witnesses whom Bass had been unable to contact. 9 The trial court again acted within its discretion in determining that [*20] any delay in procuring the witnesses was a direct result of Bass's untimely request to represent himself, and consequently violated the conditions of the court's grant of the Faretta motion. The court's decision was further supported by its provision of a one-week delay in the trial to accommodate Bass's belated attempts to procure witnesses and its determination, after that week had elapsed, that the witnesses Bass identified were either unlikely to appear within a reasonable time or would provide no relevant information to support the defense (or both). 10 (Jenkins, supra, 22 Cal.4th at p. 1037 ["When a continuance is sought to secure the attendance of a witness, the defendant must establish 'he had exercised due diligence to secure the witness's attendance, that the witness's expected testimony was material and not cumulative, that the testimony could be obtained within a reasonable time, and that the facts to which the witness would testify could not otherwise be proven' "].)

FOOTNOTES

9 Bass recognizes that the contention is "related" to the previous contention, but sets it forth "separately [in his brief] to show just how prejudicial [the initial] denial of a continuance was."

10 Bass indicated [*21] a desire to present six witnesses -- four police officers involved in the investigation of the case, the prosecutor and a civilian witness named Michael Bellow. Bass had not spoken with any of the witnesses about appearing at trial, and conceded that the one witness who may have had significant factual information -- Bellow, who Bass claimed had sent Bass the fraudulent $ 450,000 check -- was a foreign national, residing at an unknown address in Lagos, Nigeria, and had not been in contact with Bass in three years. Bass did not provide any support for his request to subpoena the prosecutor, and his proffer of the likely testimony of the police officers presented little prospect that their testimony would be material to the issues in the case.

In sum, while the record in this case demonstrates the oft-stated point that self-representation is generally unwise (particularly where, as here, a Farretta request is made on the day of trial), it was Bass who chose to represent himself despite the trial court's strong and repeated urging that he not do so. Having made his request

on the day of trial and accepted the trial court's conditioning of a grant of the request on a commitment that Bass's [*22] self-representation would not occasion any delays in the proceedings, Bass cannot obtain reversal on his current claims that the trial court erred by not granting a continuance to allow him more time to prepare. (Valdez, supra, 32 Cal.4th at pp. 102-103; Clark, supra, 3 Cal.4th at p. 110). 11

FOOTNOTES

11 Having determined that the trial court did not abuse its discretion in denying Bass's continuance requests, we also reject, for the same reasons, Bass's conclusory assertions that the trial court's actions in denying his continuance requests were so arbitrary as to violate his constitutional rights to due process and to counsel under the Sixth Amendment. (See Morris v. Slappy (1983) 461 U.S. 1, 11-12 ["broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel"]; Ungar v. Sarafite (1964) 376 U.S. 575, 589 ["it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel" and whether a "denial of a continuance is so arbitrary [*23] as to violate due process" depends on "the circumstances present in every case, particularly in the reasons presented to the trial judge at the time [of] the request"].) With respect to his Sixth Amendment challenge, we recognize, of course, that Bass's decision to represent himself certainly implicated the resulting effectiveness of his representation in that it substituted a prepared, experienced defense lawyer (Tandon) with a less prepared, untrained one (Bass). Nevertheless, it was Bass who knowingly and voluntarily elected to represent himself on the condition that there would be no delay in the proceedings, and thus any deficiency in the resulting representation was waived. (See United States v. Conder (6th Cir. 1970) 423 F.2d 904, 908 ["The right to defend pro se and the right to counsel have been aptly described as 'two faces of the same coin,' . . . in that the waiver of one right constitutes a correlative assertion of the other"]; People v. Bloom (1989) 48 Cal.3d 1194, 1226 ["Defendants who have elected self-representation may not thereafter seek reversal of their convictions on the ground that their own efforts were inadequate and amounted to a denial of effective assistance [*24] of counsel"].)

II

The Trial Court Did Not Violate Bass's Statutory Right to a Minimum Five-day Continuance Under Section 1049

In a related argument, Bass contends that the trial court violated his statutory right under section 1049 to a minimum five-day continuance following a defendant's entry of his plea, because during the trial proceedings the trial court arraigned Bass on, and Bass entered a not guilty plea to, an amended information. 12 We disagree.

FOOTNOTES

12 The operative information was, in fact, amended twice during trial proceedings. Once on the morning of trial to create a "cleaned-up document," and once during the presentation of the prosecution's case to add a venue allegation. Neither amendment altered the substantive charges on which Bass was tried, which had been presented in an information filed months earlier. Bass contends in this argument that a continuance was required based on the morning of trial "clean[]-up" amendment, presumably because that amendment roughly overlaps the time in which Bass sought to represent himself, and subsequently requested a continuance.

Section 1049 states that, "[a]fter his plea, the defendant is entitled to at least five days to prepare for [*25] trial." In the case of an amendment to a preexisting complaint or information, however, section 1049 must be read in conjunction with section 1009. Section 1009 permits a court to allow amendment of an existing information "at any stage of the proceedings," and provides that the "defendant shall be required to plead to such amendment or amended pleading forthwith." (§ 1009). More significantly, section 1009 states that in such circumstances, "trial . . . shall continue as if the pleading had been originally filed as amended, unless the substantial rights of the defendant would be prejudiced thereby, in which event a reasonable postponement, not longer than the ends of justice require, may be granted."

Here, Bass had already pleaded to an information containing each of the charges against him on January 27, 2006, and consequently section 1009, which specifically sets out the trial court's obligations with respect to a defendant's plea to an amended information, controlled. (See Arbuckle-College City Fire Protection Dist. v. County of Colusa (2003) 105 Cal.App.4th 1155, 1166 ["Generally, it can be presumed that when the Legislature has enacted a specific statute to deal with a particular [*26] matter, it would intend the specific statute to control over more general provisions

of law that might otherwise apply"].) Section 1009 requires the trial court, after an amendment is made, to proceed "as if the pleading had been originally filed as amended," and to permit a delay only if "the substantial rights of the defendant would be prejudiced thereby." (§ 1009.)

Bass has made no showing that continuing without delay after the amendment prejudiced his "substantial rights." (§ 1009.) The charges on which Bass was tried were all contained in the original information presented well before trial, and the "clean[] up" amendment did not alter the substance of those charges. In fact, Bass never requested a continuance based on the amended pleading, and fails to present any argument on appeal as to why the amendment necessitated any delay.

Bass's contention appears to be that because the trial court's denial of his request for a continuance on other grounds coincidentally overlapped with the time period during which the prosecution amended the information, section 1049 triggered an automatic right to a five-day continuance, and "[t]he court could not abrogate that statutory right by conditioning [*27] the granting of Faretta rights on the giving up of a continuance." As noted above, however, section 1049, read in conjunction with section 1099, did not permit, much less require, a continuance on the basis of the amendment. 13 Consequently, the amendment did not trigger any "statutory right" to a continuance.

FOOTNOTES

13 The case Bass relies on in his argument, Wilkins, supra, 225 Cal.App.3d 299, 308, is unavailing, as that case relies on the principle that a grant of an untimely Faretta motion requires the granting of a continuance. As noted in part I.B., ante, this principle has been modified by more recent pronouncements of our Supreme Court.

III

The Trial Court Did Not Err by Permitting Bass To Be Tried Without a Jury After Amendment of the Information to Include a Venue Allegation

Bass contends that the trial court erred by continuing with a nonjury trial after allowing the prosecution to again amend the information (this time during the prosecution's case-in-chief) to include allegations supporting venue in San Diego

with respect to counts 9 and 10. Bass argues that the amendment to the information required a second waiver of his jury trial rights. We disagree.

After Bass waived his rights [*28] to a jury trial on all counts, asserting that he believed he would get a fairer hearing from the court than from the jurors who he thought might have "personal issues" that could result in bias against him, the prosecution, in its case-in-chief, moved to amend the information to include a "venue allegation" on counts 9 and 10. 14 Bass initially objected to the amendment, but later withdrew his objection. The trial court allowed the amendment. (See § 1009 ["The court in which an action is pending may order or permit an amendment of an indictment, accusation or information, or the filing of an amended complaint, for any defect or insufficiency, at any stage of the proceedings"].) Bass pleaded not guilty to the amended information, and the court continued with the nonjury trial without obtaining a second waiver of Bass's jury trial rights. 15

FOOTNOTES

14 The allegation stated: " 'It is further alleged that the above offense was committed in part in San Diego and in part in Orange County and the acts and effects thereof constituting . . . the offense occurred in San Diego County and Orange County within the meaning of Penal Code Section 781.'" (See § 781 ["When a public offense is committed in part [*29] in one [jurisdictional territory] and in part in another, or the acts or effects thereof constituting or requisite to the consummation of the offense occur in two or more [jurisdictional territories], the jurisdiction [of such offense] is in [any competent court within either jurisdictional territory]"].)

15 Bass did not object to the continued nonjury proceedings in the trial court and, in fact, later confirmed in an unrelated scheduling colloquy that he was not requesting a jury trial on the severed counts -- counts 11 and 12.

As Bass does not challenge the fact that he knowingly and voluntarily waived his right to a jury trial on all counts prior to trial, his contention rests on the argument that the amendment of the information extinguished his initial valid jury trial waiver. This argument fails, however, due to the nonsubstantive nature of the amendment to the information.

The pertinent considerations are laid out in People v. Walker (1959) 170

Cal.App.2d 159 (Walker), the primary case relied on by Bass for his argument. In Walker, our colleagues in the Second District ruled that the prosecutor's amendment of an information charging drug possession to include an allegation of drug [*30] sale required a new jury trial waiver. The court stated that because "the offenses of sale and possession of narcotics are separate and distinct crimes" and sale is a "far more serious offense" than possession, "[i]t is not unreasonable to assume" that "although an accused might be willing to waive a jury on a charge of possession, he would not care to do so on the grave offense of sale." (Id. at p. 165; see also People v. Sanders (1987) 191 Cal.App.3d 79, 83 [holding that amendment that added a separate count to an existing information required a separate jury trial waiver as to the amended count].) In the instant case, by contrast to Walker and Sanders, the amendment to the information did not add a more serious charge, alter the substantive charges against Bass or add a separate count. Rather, the amendment simply added an allegation that two of the previously charged offenses were committed in part in San Diego County.

Bass presents no argument as to how the venue allegation altered the substantive charges against him in a manner that would cast a doubt on whether his original jury waiver remained operative. He merely asserts in conclusory fashion that the amendment "totally changed [*31] and lightened the burden of proof" on counts 9 and 10 by making "possible what was impossible before the amendment, proof that counts 9 and 10 were within the jurisdiction of the superior court." In fact, however, "[v]enue does not implicate the trial court's fundamental jurisdiction" to try a defendant, and is properly characterized as "a 'procedural issue[] that do[es] not relate to . . . guilt or innocence' at all." (People v. Posey (2004) 32 Cal.4th 193, 208, 215; People v. Simon (2001) 25 Cal.4th 1082, 1096 [" 'If the crime is one over which California can and does exercise its legislative jurisdiction because it was committed in whole or in part within the state's territorial borders, California courts have jurisdiction to try the defendant[,] no matter where located in the state"].) Further, "venue is a question of law for determination by the court" (Posey, at p. 215), and thus the addition of a venue allegation, unlike other potential amendments to an information that could impact the evidence presented and facts found by a jury, is singularly unlikely to call into question the considerations underlying an initial jury trial waiver.

In sum, as there was no basis to believe [*32] that the addition of a venue allegation to the information implicated Bass's original jury trial waiver, that waiver remained operative, and the trial court was not obligated to sua sponte obtain a second waiver. (People v. Smylie (1963) 217 Cal.App.2d 118, 122 [holding that

original jury trial waiver remained operative despite amendment of information to enumerate violation of specific vehicle code section, and distinguishing Walker on the ground that amendment "was not substantial"]; People v. Gary (1968) 263 Cal.App.2d 192, 197 [new jury trial waiver not required where "[n]o new offense was substituted," and the change to information was not "a substantial one"]; § 1099 [authorizing amendment of an information at any stage of the proceedings and providing that "the trial . . . shall continue as if the pleading had been originally filed as amended, unless the substantial rights of the defendant would be prejudiced thereby"].) 16

FOOTNOTES

16 We also reject Bass's contention that the trial court's failure to determine whether Bass still desired a nonjury trial after the amendment of the information violated his constitutional rights to a jury trial. There was no constitutional violation because [*33] Bass voluntarily waived his rights to a jury trial on the offenses for which he was convicted and, as we have discussed, the amendment of the information did not extinguish Bass's earlier waiver.

IV

Convictions Both for Taking and Driving a Vehicle and Receiving That Vehicle Knowing It To Be Stolen Are Not Unlawful in This Case

Bass contends that he cannot be convicted both of stealing a car under Vehicle Code section 10851, subdivision (a) and of receiving the same car as stolen property under Vehicle Code section 496. We are bound by controlling precedent to reject this contention.

Bass was convicted of unlawfully taking or driving a vehicle in violation of Vehicle Code section 10851, subdivision (a), 17 and receiving that same vehicle knowing it to be stolen, in violation of Vehicle Code section 496. 18 Vehicle Code section 496 states, however, that "no person may be convicted both pursuant to this section and of the theft of the same property."

FOOTNOTES

17 Under Vehicle Code section 10851, subdivision (a), it is a crime to "drive[] or

take[] a vehicle . . . without the consent of the owner thereof, and with intent either to permanently or temporarily deprive the owner thereof of . . . possession [*34] of the vehicle."

18 Under Vehicle Code section 496, subdivision (a), it is unlawful for any person to "buy[] or receive[] any property that has been stolen . . ., knowing the property to be so stolen."

While the statutory text appears, on its face, to resolve the matter in Bass's favor, (see People v. Garza (2005) 35 Cal.4th 866, 876 (Garza) ["A person who violates [Vehicle Code] section 10851[, subdivision ](a) by taking a car with the intent to permanently deprive the owner of possession, cannot also be convicted of receiving the same vehicle as stolen property"]); in fact, Vehicle Code section 496's disclaimer has been interpreted to have limited application when the property at issue is a stolen car. This is because under Vehicle Code section 10851, subdivision (a), a person may be convicted not only of the unlawful taking, but also the unlawful driving, of a vehicle. Our Supreme Court has held that in the latter but not the former case, the defendant may then also be convicted of receipt of the stolen car under Vehicle Code section 496, because he has not been convicted of theft of the car only driving it. (Garza, supra, 35 Cal.4th at p. 876 [when "a [Vehicle Code] section 10851[, [*35] subdivision ](a) conviction is based on post-theft driving, a separate conviction under . . . [Vehicle Code] section 496[, subdivision ](a) for receiving the same vehicle as stolen property is not precluded"].) In light of the above case law, then, while we would reverse convictions for both taking and receiving the same stolen car, we are obligated to affirm convictions for driving and receiving the same stolen car.

Where, as in this case, it is unclear whether the Vehicle Code section 10851, subdivision (a) conviction is for driving or taking the car (or both), we are required to apply a form of harmless error analysis. Both convictions must be affirmed if "it is not reasonably probable that a properly instructed jury would have found the defendant guilty of violating [Vehicle Code] section 10851[, subdivision ](a) by stealing the car but not by post-theft driving." (Garza, supra, 35 Cal.4th at p. 882, italics added.) Here, of course, there was overwhelming evidence that if Bass stole the car, he also drove it well after the initial unlawful taking had ceased (even going so far as to take it in for service at the dealership). Consequently, there is no reasonable probability that the [*36] judge would have found Bass guilty of stealing the car, but not of unlawful posttheft driving, and both convictions must be

upheld. (Garza, supra, 35 Cal.4th at p. 882 [affirming convictions for violating Vehicle Code §§ 1085, subd. (a) & 496, using above analysis where "the theft of the vehicle six days earlier was long since complete, and the driving therefore constituted a separate, distinct, and complete violation of [Vehicle Code] section 10851[, subdivision ](a)"].) 19

FOOTNOTES

19 We recognize that it is somewhat counterintuitive that the Legislature would desire to punish more severely those who unlawfully drive, as opposed to those who unlawfully take a vehicle - the effect of the now-controlling case law - but we are bound by the holding of our high court in Garza to that effect. (Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455.)

V

Only One Conviction of Grand Theft and One Conviction of Attempted Grand Theft Can Be Sustained

Bass contended in his initial appellate brief that his sentence on counts 3 through 8 -- the wire transfers of the funds derived from his counterfeit $ 450,000 check -- should have been stayed pursuant to section 654. The Attorney General conceded [*37] this point but sought a remand so that the trial court "could reasonably adjust the unstayed sentences to an appropriate sentence in line with its original sentence." In supplemental briefing, Bass now contends that counts 3 through 8 must be reduced to one single count of grand theft. The Attorney General again concedes the point, and we agree that the concession is warranted.

The controlling legal rule is that "in a series of takings from the same individual, there [is] a single theft if the takings [are] pursuant to one continuing impulse, intent, plan or scheme, but multiple counts if each taking [is] the result of a separate independent impulse or intent." (People v. Packard (1982) 131 Cal.App.3d 622, 626 [reversing multiple convictions for grand theft where the evidence showed that defendant fraudulently obtained over $ 472,000 in checks that were "paid several times per month" over a two-year period in an amount of several thousand dollars per check]; People v. Djekich (1991) 229 Cal.App.3d 1213, 1221 ["under such circumstances where a defendant acts in a constant fashion but with a single intent and objective in mind, that defendant can only be convicted of a single offense"].)

[*38] Here, the evidence indisputably shows a single scheme beginning with the deposit of the counterfeit check to deprive the same victim (Rancho Santa Fe Bank) of the funds deposited in Bass's checking account over a period of a few days' time. Consequently, only one conviction for grand theft can be sustained based on the prosecution's evidence, as opposed to the six counts in the judgment before us (counts 3-8). (People v. Kronemyer (1987) 189 Cal.App.3d 314, 363 [reversing multiple theft convictions where the evidence established multiple illicit withdrawals from a savings account over a four-day period, based on a single scheme to obtain all the funds in the account].) 20 As the Attorney General notes, the same reasoning applies to the two counts of attempted grand theft (counts 9 & 10) based on the two checks that Bass attempted to exchange for one cashiers check from Comerica Bank.

FOOTNOTES

20 See also People v. Shabtay (2006) 138 Cal.App.4th 1184, 1192 ("If a defendant is improperly convicted of multiple counts of grand theft where only one grand theft conviction is proper, we have held that the appropriate disposition is to reverse the unauthorized convictions. . . . Where, as here, we conclude [*39] as a matter of law that multiple convictions are not authorized, the issue may be raised on appeal even in the absence of an objection in the trial court").

Consequently, we remand for the trial court to vacate five of the grand theft convictions and one of the attempted grand theft convictions. As a result of these changes to the underlying judgment, Bass must be resentenced. (See Kronemyer, supra, 189 Cal.App.3d at p. 364.)

VI

The Trial Court Should Allow Bass an Opportunity to Present Mitigating Evidence on Resentencing

Based on our conclusion in part V, ante, that resentencing is required, we need not resolve Bass's alternative contention that a new sentencing hearing is also required on the ground that the trial court abused its discretion in declining to continue his previous sentencing hearing and denying his request for advisory counsel. Instead, we mandate that on remand the trial court should permit Bass an opportunity, with or without the assistance of counsel, 21 to present any relevant sentencing evidence.

FOOTNOTES

21 If Bass again requests advisory counsel to assist in his preparation for sentencing, the trial court should consider that request in light of the constraints placed [*40] on Bass's ability to represent himself by his custodial status. (See Jenkins, supra, 22 Cal.4th at p. 1040 [recognizing that "a defendant who is representing himself or herself may not be placed in the position of presenting a defense without access to a telephone, law library, runner, investigator, advisory counsel, or any other means of developing a defense," and that "[w]hen the defendant has a lawyer acting as advisory counsel, his or her rights are adequately protected"].)

22 For purposes of the new sentencing hearing, we note that contrary to the trial court's apparent contention at the previous sentencing hearing that "character is not at issue" in sentencing, the defense is permitted to present character evidence in an effort to influence the ultimate sentence imposed. (People v. Covino (1980) 100 Cal.App.3d 660, 670-671 [remanding for resentencing where trial court "failed to give consideration to the factors stated in the attorney's, employer's, and friend's letters" that the defendant "was a good worker, a kind person, and that he had a drinking problem," all of which "could be considered as mitigating factors"].)

DISPOSITION

The judgment is affirmed in part and reversed in [*41] part, and the case is remanded for sentencing proceedings consistent with this opinion.

IRION, J.

WE CONCUR:

NARES, Acting P.J.

McINTYRE, J.