CHARLES R. KHOURY JR.
Attorney at Law
Calif. State Bar No. 42625
P.O. Box 1066
34 Orchard View Drive
Wilton N.H. 03086
603 654 2050 phone
charliekhouryjr@yahoo.com
Pro bono Attorney for Petitioner Robert Bass

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

Civil No. 08-0274JMPCL

| | |
|---|---|
| ROBERT C. BASS<br>Petitioner,<br>**v.**<br>MATTHEW CATE, Secretary, et al.<br>Respondent. | MEMORANDUM OF POINTS AND AUTHORITIES AND ARGUMENT IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS |

COMES NOW CHARLES R. KHOURY JR, a member of the bar of this Court, and as pro bono counsel in the above entitled matter, submits this MEMORANDUM OF POINTS AND AUTHORITIES AND ARGUMENT IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS

**PRELIMINARY STATEMENT**

Petitioner rightly felt uncomfortable with his own lawyer who called him a “liar and a con artist” which defense counsel agreed he had said. In turn his lawyer told the judge that petitioner “wished a brain tumor on me so that I could be relieved off the case.” (2A RT212, 215.) A relationship conducive to effective assistance of counsel was not budding here.

Nonetheless the judge denied the *Marsden*[1] motion where these statements were made and it was then that petitioner asked to represent himself. The judge said if he did allow that, petitioner would have to go to trial that day. Petitioner said he was not ready to go to trial and would need a continuance. (*Id.* at 221-223.) This was no delaying tactic but a desperate move to avoid putting your life in the hands of one who told you to take a "deal" when that attorney had not yet received any of the voluminous discovery. (March 7 RT p. 21.)

Petitioner Bass was forced to choose between representing himself while unprepared or proceeding with appointed counsel who admitted he told the petitioner he was a liar and a crook.

Bass did not get his *pro per* privileges put into the jail computer for the first four days of the trial therefore he could not make phone calls. PCC[2] was not informed of his pro per status for four days. (7RT 1502.) He did not have a runner, he did not have an investigator, he got back to the jail too late after being in court all day to make phone calls or go to the library.(4RT 904.) He did not get a runner and an investigator appointed him until the fourth day of what was a five and one half day trial. (6RT 1407.)

He was still getting discovery from the prosecutor on the fourth day of the five day trial. (4RT1001-1004.) Bass was in an impossible situation. There was no legitimate reason for the court not to grant him a continuance since there was no jury waiting. Petitioner had waived jury. The judge, over petitioner's objection, a shouted "No", deemed that petitioner had rested. Petitioner was denied Due Process and a fair trial under the Fourteenth Amendment.

---

[1] *People v. Marsden*, 2 Cal.3d 118 (1970)

[2] Private Conflict Counsel, the organization which provides investigative and runner assistance and funds and services to defendants representing themselves.

## ISSUE PRESENTED TO THE FEDERAL COURT

**PETITIONER WAS DENIED FEDERAL DUE PROCESS UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS WHEN, IN A COURT TRIAL, THE TRIAL JUDGE DENIED HIM A CONTINUANCE AFTER GRANTING HIM HIS *PRO-PER* RIGHTS**

This writer can find no reported or unreported California or Federal decision which supports even remotely the result of the District Court of Appeal in this case.

The petition should be granted because, in essence, the trial judge set an unconstitutional trap for petitioner Bass by granting a *pro per* request on the day of trial and then refusing any sort of continuance to allow Bass to defend himself. Bass was in custody with no runner, no investigator until the trial was 80% over, almost 800 pages of discovery an unplayable CDs dumped on him the second day of trial, and no ability to make phone calls because his pro per status had not been put into the prison computer.

The unpublished opinion of the court of appeal dealt with this problem by leaving out crucial facts and mis-stating others.

Federal Due Process under the Fourteenth Amendment demands more than being sent "up the creek without a paddle" by a trial judge's decision granting *pro-per* status and then denying a continuance under these circumstances.

## STATEMENT OF THE CASE

Petitioner Robert Bass[3] was charged in Count One of an amended information filed on the first day of his trial, April 3, 2006, with fraudulently passing a fictitious check on December 5, 2002 in violation of Penal code section 476.

Count Two charged that burglary was committed on December 5, 2002,

---

[3]All the remaining counts refer to petitioner as being the one charged.

when Bass entered the Rancho Santa Fe National Bank with intent to commit theft in violation of Penal Code section 459.

Count Three charged Grand Theft of Personal Property from Rancho Santa Fe National Bank in violation of Penal Code section 487 subdivision (a) by wiring $75,020 to Jann Marie Morgan on December 6, 2002.

Count Four charged Grand Theft of Personal Property from Rancho Santa Fe National Bank in violation of Penal Code section 487 subdivision (a) by wiring $15,020.00 to Curtis Sports Management Properties, Naples Florida on December 6, 2002.

Count Five charged Grand Theft of Personal Property from Rancho Santa Fe National Bank in violation of Penal Code section 487 subdivision (a) by wiring $80, 967.00 to GMG Motors on December 6, 2002.

Count Six charged Grand Theft of Personal Property from Rancho Santa Fe National Bank in violation of Penal Code section 487 subdivision (a) by wiring $30,040.00 to Raymond Nola, Auckland, New Zealand on December 6, 2002.

Count Seven charged Grand Theft of Personal Property from Rancho Santa Fe National Bank in violation of Penal Code section 487 subdivision (a) by wiring $50,005.00 to F.I.M. Research Associates on December 9, 2002.

Count Eight charged Grand Theft of Personal Property from Rancho Santa Fe National Bank in violation of Penal Code section 487 subdivision (a) by withdrawing $25,000.00 on December 9, 2002.

Count Nine charged attempted grand theft of personal property from Comerica Bank to wit: Check No. 105004 for $444,954.32 in violation of Penal Code section 487 subdivision (a) and Penal Code section 664.

Count Ten charged attempted grand theft of personal property from Comerica Bank to wit: Check No. 105002 for $440,200.00 in violation of Penal Code section 487 subdivision (a) and Penal Code section 664.

Count 11 charged that on September 27, 2004, Robert C. Bass drove the

personal property of BUDGET CAR RENTAL without the consent of and with intent either permanently or temporarily to deprive the owner of title and possession of the vehicle in violation of Vehicle Code section 10851subdivision (a).

Count 12 charged that on December 14, 2005, Robert C. Bass did withhold a vehicle, the property of BUDGET CAR RENTAL which had been stolen, knowing such property to be stolen, in violation of Penal Code section 496 subdivision (a).

(1CT 17-20.)

On January 30, 2006 petitioner made a motion to replace his appointed attorney under *Marsden* which was denied. He also made a motion to represent himself which was also denied. (1CT 113.)

On March 7, 2006, petitioner made another *Marsden* motion and before it was heard, he was asked if he wanted to represent himself or have a new lawyer. He said he wanted a new lawyer. The *Marsden* hearing was heard and then denied. (1ART[4] 3,4; 1A ART 21.)

On April 3, the case was sent out for trial. A third *Marsden* motion was made and denied. After denial, petitioner made a motion to represent himself but stated he would need a continuance if that were granted . Defense counsel asked to speak to petitioner off the record. (2A RT 221-223.)

Back on the record , petitioner 's attorney stated that petitioner had withdrawn his motion to represent himself.(2RT 224.)

A motion to sever Counts 11 and 12, regarding the rental car, was granted. (2RT 226.)

The afternoon session commenced with the granting of petitioner's motion to represent himself. Petitioner's motion for continuance was denied. (2RT236, 242, 245-46 of April 3, 2006.)

Jury selection commenced with petitioner in pro per. He had no

[4]ART is augmented reporter's transcript.

discovery at that point but the judge and prosecutor stated petitioner did not need discovery to pick a jury. (2RT 247 .)

The next morning petitioner attempted to waive jury but the District Attorney's Office did not agree to waiver. (3RT 406.) He also asked for a continuance as he had just gotten over 700 pages of discovery that morning. (3RT 414.)

The continuance motion was denied. The jury waiver was ultimately accepted by the District Attorney's Office. (3RT 415.)

The trial proceeded as a non-jury trial.

At the afternoon session of Thursday, April 6, the fourth day of trial, petitioner again moved for a continuance and to be appointed an investigator and runner. (5RT 1054.) The continuance was denied. (1CT 122.) At the end of the afternoon session the judge appointed an investigator and a runner. (1C5RT 1098.)

On Friday, April 7, the fifth day of trial, petitioner was arraigned on the second amended complaint . The Comerica Bank charges (Counts 9 and 10) were amended to allow joint venue pursuant to Penal code section 781[5] in San Diego and Orange Counties. (6RT 1308-09; 1CT 55-59.)

The severed trial as to car theft and receiving stolen property (Counts 11 and 12) began. The prosecutor rested at the end of the morning session. At the beginning of the afternoon session, petitioner asked again for a continuance. The continuance was denied. The defense rested as to Counts 11 and 12. (1CT 125; 6RT 1406.) The trial was to recommence at !:30 on Wednesday, April 12, 2006. (1CT 125.)

On Wednesday, April 12, trial re-commenced and petitioner made a

---

[5] When a public offense is committed in part in one jurisdictional territory and in part in another, or the acts or effects thereof constituting or requisite to the consummation of the offense occur in two or more jurisdictional territories, the jurisdiction of such offense is in any competent court within either jurisdictional territory.

motion to continue as there had not been enough time for his investigator to subpoena witnesses. The motion was denied and over defense objection, the defense was deemed to have rested by the judge. After argument, petitioner was found guilty of all charges and sentencing was set for May 10, 2006, (1CT 127-129.)

On May 10, 2006, petitioner moved for a continuance of the sentencing and for advisory standby counsel. Both motions were denied as was a motion to disqualify the judge for bias. (1CT 131.)

Petitioner was sentenced as follows:

The mid-term of 2 years in state prison for Count 1, forgery, P.C. 246;
Count 2: The mid-term of 2 years for burglary, stayed pursuant to P.C. 654;
Count 3: 1/3 the mid-term for Grand Theft, 8 months consecutive;
Count 4: Middle Term of 2 years for Grand Theft, concurrent;
Count 5: Middle Term of 2 years for Grand Theft, concurrent;
Count 6: Middle Term of 2 years for Grand Theft, concurrent;
Count 7: 1/3 the mid-term for Grand Theft, 8 months consecutive;
Count 8: Middle Term of 2 years for Grand Theft, concurrent;
Count 9: 1/3 the mid-term for Grand Theft, 4 months consecutive;
Count 10: Middle Term of 12 months for Grand Theft, concurrent;
Count 11: 1/3 the mid-term for unlawful taking and driving a vehicle, 8 months consecutive;
Count 12: 1/3 the mid-term for receiving stolen property, 8 months, stayed pursuant to P.C. 654.
The total term was four years and four months. (1CT 13-132.)

An appeal followed (1CT 103-108.)

Petitioner's convictions of five grand theft counts(Counts 4-8) and one attempted grand theft charge (count 10) were reversed in the Court of Appeal on the basis of fragmentation of what was really one charge.

A petition for review was filed and denied. Petitioner was re-sentenced and is presently in custody.

# STATEMENT OF FACTS

## Testimony Concerning Counts 1 Through 3 and Count 9 Of The Severed Case.

### Prosecution Case

### Doug Thompson

Doug Thompson is operations administrator for First National Bank. He manages the branch managers of all the branches of the First National Bank. He has been in banking over 25 years. (3RT 421.)

His bank was known as Rancho Santa Fe National Bank before March 2003. Rancho Santa Fe purchased First National Bank and they retain the First National Bank name. (3RT 422.)

On December 2002, petitioner Bass opened two bank accounts. One was a business checking account and the other was a business money market account under the name of Curtis Sports Management Group.

The business was Sports Management and Training.

Between November and December 5th there was an average balance of around $333.55.

On December 5, 2002, there was a deposit of an official check from the Clark County Credit Union in Las Vegas Nevada for $450,000. (3RT 428.) It was payable to the Curtis Sports Management Group. The signature was somewhat illegible but it appeared to be signed by Wayne Few. (3RT 429.)

The check was signed by petitioner on the back and deposited into petitioner's checking account on December 5th 2002 at the Encinitas branch office of the Rancho Santa Fe Bank.(3RT 430.)

A check of this magnitude will go to the supervisor for guidance and be held for an extended period of time. The supervisor would probably call the credit union to verify issuance of the check and place a hold on it to make sure

the check clears properly. (3RT 431.)

The teller brought it to the attention of the supervisor of the Rancho Santa Fe office, but the supervisor did not follow the procedures properly. The funds were made available immediately.

The following transfers were made out of the account : One was for $75,000,TO Jann Marie Morgan at Union Bank of California on Dec 9th. It was authorized by Robert Bass on December 6th. (3RT 432-435.)

A $15,000 wire was authorized by Bass to be sent to Naples, Florida, for Curtis Sports Management. That wire was authorized December 6th and actually sent on December 9th. (3RT 435.)

The $80,967 requested wire-transfer went to Community National Bank in Fargo, North Dakota for the benefit of GMG Motors, attention Paul Denny. That was also requested December 6th by fax, verification that Mr. Bass had sent the fax request was made by phone on December 9th.

A $30,000 wire of money was requested by Mr. Bass on December 6th and, on the 9th, it went to Glenn Eden bank in Auckland, New Zealand for the benefit of Raymond Nola. (3RT 436.)

On December 9th, Bass requested the bank to issue a cashier's check for $50,000 to FIM Research Associates. (3RT 438.)

On December 9th, there was a withdrawal of $25,000 by counter check.(3RT 438-439.)

On December 10th, the bank received notification from Wells Fargo that they believed the check to be counterfeit; they had no record of the check or its account number. (3RT 439.)

At that point, no more activity was allowed on the account. Rancho Santa Fe Bank contacted the institutions to whom they wired money to see if they could try to get some of that money back, and on December 10th. The

bank "would have" contacted Mr. Bass. (3RT 440.)

With regard to the wire to Jann Marie Morgan for $75,000, they were able to get $46,854.37 of it back. (3RT 441.)

With regard to the $15,000 wire transfer to the bank in Naples, Florida, they were unable to recover any funds. (3RT 441.)

As to the $80,967 that went to Fargo, North Dakota, they got all the money back.

As to the $30,000 that were sent to Auckland, New Zealand, they got none back. (*Id.*)

As to the $50,000 cashier's check to F.I.M. research, they received $15,600.04. (*Id.*)

As to the $25,000 that was withdrawn on December 9th, none of the money was returned. (*Id.*)

There was an additional withdrawal on December 10th of $6,000, none of that was returned.

The bank received a total of $143,421.41 back. There was $5313.92 in legal fees for attorneys who wrote letters requesting return of the money.(3RT 442.)

Mr. Bass was contacted by another bank employee, not the witness Mr. Thompson. Thompson concluded from the bank records that petitioner did not assist the Bank in retrieving the wired money. (3RT 443.)

Thompson found a letter in the file dated December 26th addressed to Jarrod Wolf, the Bank's attorney, apparently from petitioner, asking the Bank to accept a wire transfer for the total amount owed the Bank. The letter refers to$ 201,000 of funds owed the Bank being wired from the National Westminster Bank of London by noon December 27th 2002. No such funds arrived but petitioner did transfer $19,105.50 from his money market account on December 12, 2002 back to petitioner's checking account. (3RT 454.) A credit

was made to the account to "charge it off" to zero.

Thompson also said there was a fax from petitioner to Gale Lawhead, the supervisor of the Rancho Santa Fe Branch dated December 11, 2002 stating that "300 million" in funds would be arriving that day. That money never arrived in account 467 or petitioner's money market account . (3RT 446.)

After all the transactions, recoveries and net losses in petitioner's checking account it had a net balance of $1215.50 and Thompson did not know how that figure was arrived at.

Thompson said that if the check in question was received on Thursday, December 5th, it would probably take the Bank 5 business days, until the following Thursday, to insure it was a good check. The Bank could call the issuing bank by phone to verify it was a good check and reduce this time to three days. (3RT 452.)

The total loss to the Bank was $142,654.01. The amounts that were wired out and withdrawn from the account were $282,067. They recovered $143,421.41. There are legal fees of $5,313.92 and there was $1,305.50 left on deposit in account 467.(3RT 455.)

**THE COSTA MESA COMERICA BANK CHARGES, COUNTS 9 and 10**

**Diana Curtis**.

She's employed as an escrow officer at Stewart Title of Sacramento and has been so employed for the last 20 years. She was contacted in early 2003 by a bank teller at Comerica Bank in Orange County (Comerica) with regard to two checks that were being presented to the Bank at that time. (3RT506-07.) Copies of the two checks were faxed to her by the Comerica teller. (3RT 507.)

She was asked to determine if they were valid checks. (3RT 508.) She checked her escrow log and determined that there were no checks written for those dollar amounts to those individuals for that escrow file. Check No. 004

was in the amount of $444,954.32 and check 002 was for $440,200 even. Both checks were made payable to CURTIS SPORTS MANAGEMENT GROUP care of Robert Bass on Nantucket Court in Leucadia California. The dates of the checks were January 16, 2003 and January 14th 2003. (3RT 511.) The escrow number listed on the checks had closed in 2001.

She had asked her bookkeeper to research the checks prior to coming to court and those checks were internal "fee" checks, checks written to Stewart Title themselves. (3RT 511-512.)

She told the teller from Comerica that they did not appear to be valid checks and that she would fax them to her bookkeeping department.

There were irregularities in the checks themselves compared to the normal appearance of Stewart Title checks as to the location of the date and escrow number. (3RT 515.)

Her last name is Curtis but she is not related to Robert Curtis Bass. She did not receive a call from a Robert Curtis or Robert Curtis Bass asking if the two checks were valid. (3RT 516.)

**Deborah Edillon**

She works at Clark County Credit Union,(CCCU) Las Vegas as a security officer. Sometime in January 2003 she had communication with the San Diego Deputy Sheriff Fant about the fraudulent $450,000 check, check No. 28166304.

She sent him a letter on January 27th, 2003. Before she was contacted about the check by Rancho Santa Fe National Bank (The Bank), she was called on December 5th 2002 in the morning. It was a male voice and she looked up the check No. 28166304.(3RT 528-530.) She found out that the check was first issued to Chase Manhattan Bank from the CCCU on September 18th 2002 for $1220.01. (3RT 531, 535.) She called him back at

the number (909) 764 4853. (3RT 533.)

When she talked to the male she told him that it was a counterfeit item and did not (*sic*) negotiate it. (3RT 535.)

**Cindy Ybarra**

On January 28, 2004 she worked as a CSR, customer service rep. or teller at the Comerica Bank in Costa Mesa, Orange County, California.

She was approached by two individuals who had two suspicious looking checks . One was an African-American, the other was Caucasian. (4RT 702-703.)

The African-American did most of the talking. He wanted to negotiate two checks and purchase an official bank check. They were from an escrow title account. They were in very large amounts. Over $400,000 each one. (4RT 704.)

Ybarra noticed the checks were from Stewart Title and they looked very different from checks she had seen from that company. (4RT 707.) She told the two men to have a seat. Ybarra contacted Diane Curtis who Ybarra knew was authorized to sign checks for Stewart Title. (4RT 708-09.)
Ybarra faxed the two checks to Curtis and had a co-worker phone the Costa Mesa police. (4RT 709.) The Caucasian man slowly moved away and left the bank before the police came. (4RT 710.) The African-American man was sitting in the bank.

She called the police because her manager wasn't doing anything and Ybarra had received information that the checks were fraudulent. (4RT 711.)

**Julian Michael Frost**

Frost is a Costa Mesa police officer. (4RT 744.)

On January 28, 2003 he was called to the Comerica Bank to investigate

a possible fraud. (4RT 745-48.)

He contacted Mr. Bass in the lobby. Bass seemed taken aback and a little nervous. (4RT 747.)

Bass told the Officer that he had received the two checks in the mail from a Mr. Moore in Oakland. Moore was a business partner who had received the checks from a Mr. Bellow in South Africa. (4RT 748-9.) Bass had come to the bank to get cashier's checks payable to himself. (4RT 749.)

Bass had come to the bank with a business partner, John Ervin, who had left prior to the Officer's arrival for other business at another bank. (4RT 750-51.) Bass denied the checks were forgeries. He told Frost that he had called earlier to Comerica to verify that the checks were valid as he had suspicions they weren't. (4RT 751.)

Frost arrested Bass and Frost's partner took Bass to the police station in Costa Mesa where he was given his *Miranda* rights and questioned further. (Id.)

Bass described his company as being Curtis Sports Management Group. Mr. Ervin was a business partner. (4RT 756.) Bass was looking for investors and had put his business plan on the Internet and had received interest from several people. There was an investigation going on regarding a Nigerian, an individual who took money, $60,000, from Bass' business account.

Bass said he'd received an e-mail , three weeks before the arrest from Mr. Bellow in Nigeria offering him $800,000 as an investment. Checks were sent to Mr. Moore in Oakland. Bass had to return $50,000 to Bellow. Mr. Bass thought it was too good to be true. (4RT 759.)

Bass said Mr. Ervin, his business partner had been uncomfortable in depositing the two checks and that Bass had received fraudulent checks in the past and returned them to the issuing bank.

Bass said he had contacted Deana Curtis of Stewart Title and she told

him the checks were valid. (4RT 760-61.)

Bass was in possession of a U.S. Bank statement which was in the name of Curtis Management Group. Frost reviewed the statement and noted that on December 31st 2002 there had been two deposits totaling $800,460.00. Bass said he did not know who deposited the money and the account had been closed after the bank suspected fraud. Bass had another document which was a list of persons to whom he had to wire money which he owed them.(4RT 763.)

Bass said he could get his hands on 5 million dollars but could not make the $10,000 bail. (4RT 764.) Bass said that Moore and Bellow knew his address, had him under surveillance and were threatening his life. (4RT 765.)

**Jeffrey Horner**

F.B.I. agent Jeffrey Horner was assigned to investigate the "deposit of a fraudulent check at the Rancho Santa Fe Bank December 5th of 2002." (4RT 797.) He got the case in April 2005. He brought it to the District Attorney's Office on August 18th 2005. He also participated in the arrest of petitioner on December 14th 2005. He had an opportunity to sit in on an interview of petitioner and prior to that interview he searched a vehicle "that Mr. Bass had gotten into prior to his arrest. " (4RT 7908.)

Horner found a fax cover sheet to Raymond Nola dated March 22, 2005. (4RT 800.) Horner heard Bass admit to Investigator Cargel that Bass has directed funds on 12/6/02 to be wired to New Zealand from Rancho Santa Fe National Bank. (4RT 803.) Bass described using a 5 year CD, for $30,000, as collateral to get a loan at 3% from the New Zealand Bank. That seemed unusual to Horner. (4RT 805.) Bass admitted writing the authorization for the wire transfers. (4RT 812.) He signed a statement that he wrote the wire instructions for $15,000 to Fifth Third Bank; $30,000 to Westpac Trust ; $80, 967 to Community First National; $75,000 to Union Bank of California all on

12/06/02 and that he withdrew $25,000 from Rancho Santa Fe National Bank account no. 01042467. Bass stipulated in open court that he wrote that statement. (4RT 813.)

He found a copy of the Bank Secrecy Act, also known as the Anti-Money Laundering Act in the trunk of the vehicle. (4RT 843.)

**Joseph Cargel**

Cargel is an investigator for the San Diego District Attorney's Office. (4RT 850.) He described the arrest of petitioner in Encinitas in December 14, 2005 and then his interview for two hours and 20 minutes at the Central Jail. (4RT 850-51.)

Petitioner identified the Clark County Credit Union check (People's Exh. 1) and told Cargel that the check had been sent to him by investors in his company called High Gear Athletics. The check was to be used to purchase equipment and get things started for his business. (4RT 853.) He also was going to use the money to get credit and invest some of the funds. The investors wanted $125,000 a year return on investment and that was later changed by Bass to $125,000 return every six months.

Petitioner described Curtis Sports Management as a company that was going to consist of Sports Agents, Athletes, Trainers, Physical Therapists and other people working in the sports medicine type field. (4RT 854.)

Petitioner told hm that High Gear Athletics was the parent company for Curtis Sports Management "or vice versa".

His business plan was posted on the Internet. (4RT 855.)

Petitioner said he never met the investors face to face but provided them with detailed documents about his business. (4RT 856.)

Petitioner said he did not know why the investors sent him a bogus check for $450,000. Petitioner told Cargel he was suspicious about the check and called both Clark County Credit Union in Nevada and Rancho Santa Fe Bank

to verify funds on the check. The Clark County employee told him the funds were available. She did not tell him it was a fraudulent check. (4RT 858-9.)

Petitioner said he went to the Rancho Santa Fe Bank and asked the teller to verify the funds first. The teller told him the funds would be held for 24 hours.(4RT 859.)

Petitioner told Cargel he gave Curtis Richmond $50,000 from the $450,000 check for a down payment on a house. Petitioner expected Richmond to pay him back. (4RT 860.)

When asked about the $30,000 wire to New Zealand at Westpac Trust, petitioner gave a very confusing account of setting up a 5 year CD and then borrowing back 100% of it at a lower interest rate than earned by the CD. (4RT 861-2.)

They asked petitioner about a wire of $80, 967 to Community First National Bank in Fargo North Dakota and petitioner said he was just sending it where the investors told him. (4RT 863.)

Petitioner admitted sending a wire of to Fifth third Bank in Naples Florida for operating expenses for a business partner in Curtis Sport Management. (4RT 863-64.)

He wired $75,000 to Jann Marie Morgan , a one-time girlfriend, at Union Bank of California, as a gift. People had taken advantage of her and he wanted to give her the money. (4RT 864-65.)

When asked if the investors would be upset at this use of money, petitioner “shrugged it off and said, okay, what am I guilty of.” (4RT 865.)

Petitioner said he had assisted the Bank in recovering the money to Morgan. Her account had been frozen and all of the$75,000 had been recovered.

He said that Morgan would have paid him back by being a massage therapist working with petitioner’s clients.(4RT 866.)

Petitioner said he had withdrawn $25,000 from the original $450,000 to pay personal bills. (4RT 867.)

Petitioner told them he had been arrested in Costa Mesa for a "similar situation" (4RT 868.) Petitioner had called the Escrow Company regarding the Costa Mesa check. (4RT869.)

Petitioner did not have the name or address of the investors who sent the fraudulent checks. They were going to contact him for repayment. (4RT 869-70.)

Petitioner did not contact the police to report the fraud on him by the investors. (4RT 870.)

Petitioner told him that he couldn't use the regular gyms to work as an independent contractor and therefore he was now working in the Risk Management field. (4RT 871.)

Petitioner told him he was presently employed by a trust and was on his way to Europe when he was arrested. He had been working for this Trust for three or four months. He had been given a limited power of attorney and was going to a bank to "broker a deal" for the trust. (4RT 871-73.)

**Testimony of the Severed Counts 11and 12; Vehicle Code Section 10851subdivision (a) and Penal Code Section 496 Subdivision (A), Respectively.**

**Prosecution Case**

**Jeffrey Horner**

F.B. I. Agent Jeffrey Horner searched the vehicle Mr. Bass was in at the time of his arrest and retrieved documents in petitioner's name with his address and dates into 2005. (6RT 1310–21.)

**Marlene Rose Kennedy**

Kennedy is unit manager for 9 locations of Budget Rent A Car. She has been with the company 12 years. She is familiar with the forms and business

records of the company. (6Rt 1330-31.)

The 2000 Ford Explorer in which petitioner was arrested came into the company inventory on February 18, 2004. By September 17, 2004 it had 16,900 miles on it.

Standard procedure is for the customer to produce a license and credit card and sign a rental agreement.

In the case of this particular Ford Explorer, it came into the lot “after hours”, at 6:39 p.m. at the Carlsbad rental office on September 17, 2004. (6RT 1332-35.)

The car was put on a non-revenue transfer contract. That means no money was being paid for it and it was to be transferred to another rental location. (6RtT1335.)

This was not routine. The store was closed there would not be drivers to move the vehicle.

The car was supposed to be transferred to the San Diego Airport according to the non revenue ticket. It never showed up. “There was no movement” of the car after Sept. 17, 2004 according to the records of Budget Rent A Car. The car was never returned to Budget. (6RT 1336-37.)

Ryan Frayzer was the employee for Budget who wrote the non-revenue ticket. After Sept 17, 2004[6] he was no longer working with the company. (6RT 1337-38.)

She contacted Mr. Frayzer and he gave her a number to call, 858 361 6035. She was attempting to call Rob Curtis whose name was on the non-revenue ticket as an employee of Budget Rent A Car.

She could not reach any one at that number and the loss prevention unit suggested “that we get the vehicle reported stolen.” (6RT 1338-1440.)

---

[6]On cross-exam she changed this date to September 26, 2004. (6RT 1350.)

so.

She became aware the car had been recovered by law enforcement in December 2005.

Loss to Budget Rent A Car was as follows: Impound charges were $660, damage to the vehicle $600, loss of the use of the vehicle for 13 months was be approximately $16,000. With taxes the total was $18, 209.61. (6RT 1340-41.)

She directed someone to report the vehicle stolen since it was missing. Rob Curtis or Robert Curtis Bass did not have permission to have the vehicle from September 2004 through December 2005. (6RT 1342-43.)

**Joseph Cargel**

Cargel described his arrest of petitioner on December 14, 2005 in Encinitas. Petitioner had started the car when he was arrested on a felony warrant for grand theft. (6RT 1362-63.)

At the Central Jail interview, Bass told Cargel he had arranged to have his girlfriend rent the car in Carlsbad. He assisted his girlfriend in taking back the car.

He worked out a deal with the agent for another week for $200. He had a phone number for the agent and he was allowed to hold onto the vehicle for a period of time and told by the agent not to turn the vehicle back until he was contacted by the agent. The agent told him that it will be no big deal because the car was never put in the rental system. Mr. Bass made several attempts to get in touch with the agency but it was unable to do so and decided to continue driving the car. (6RT 1369-1370.)

Petitioner decided at some point to drop the car off in December 2005 and leave a note and some money but he never did. (6RT 1371-73.)

Petitioner admitted that he had a funny feeling about keeping the car and should have turned it in. (6RT 1376.)

He assumed the rental agent must still be in contact with the car rental office as he had a friend in a federal agency run a check on the car and it did not come back stolen. (6RT 1377.)

The Prosecution rested. (6RT 1392.)

At the beginning of the afternoon session, petitioner asked again for a continuance. The continuance was denied. The defense rested as to Counts 11 and 12. (1CT 125; 6RT 1406.) The trial was to recommence at 1:30 on Wednesday, April 12, 2006. (1CT 125.)

On Wednesday, April 12, trial re-commenced and petitioner made a motion to continue as there had not been enough time for his investigator to subpoena witnesses. The motion was denied and over defense objection, the defense was deemed to have rested by the judge.

When asked to take the stand, Mr. Bass said he could not “at this moment” as there were none of his witnesses in the courtroom for whom he had issued subpoenas. He said he only had Monday and Tuesday to get his witnesses subpoenaed for Wednesday and that was not enough time. (7RT 1509.) Defendant declined to testify without his witnesses. After argument, petitioner was found guilty of all charges . (1CT 127-129.)

# I

## PETITIONER BASS WAS DENIED FEDERAL DUE PROCESS UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS WHEN THE TRIAL JUDGE DENIED HIM A CONTINUANCE AFTER GRANTING HIM HIS *PRO-PER* RIGHTS.

### A. Factual Background

Mr. Bass was arrested on December 14, 2005. He was appointed counsel on December 16, 2005. (1CT 109.) The preliminary examination was set for December 30, 2005. On that date, the preliminary exam was continued at the request of defense counsel over the objection of petitioner Bass. (1CT 111.)

After the preliminary examination, petitioner Bass, was arraigned on the information, the people's motion to dismiss counts seven through ten and thirteen and fourteen was granted. Bass requested "legal counsel" and the Judge commenced a *Marsden* hearing which was denied along with petitioner's request for pro per status. (1CT 113.)

On March 7, 2006, Bass and his lawyer appeared before Judge Danielsen who noted that a previous *pro per* request had been denied (March 7 transcript 1ART p.1)

Bass explained to the court he had completed a *Lopez* waiver form. The court asked why self-representation was denied. Petitioner's lawyer explained it was denied because the judge wanted petitioner's lawyer to read the discovery and speak more with his client. Bass still objected to the denial of the motion for self-representation.

The court asked Bass what he wanted to do now and Bass said he wanted "newly appointed counsel." (March 7 transcript 1ART4)

At the *Marsden* hearing, petitioner Bass said that Mr. Tandon had not even read the discovery yet but recommended that Bass take the 16 month offer from the prosecutor and plead guilty. Ultimately, the judge denied the

*Marsden* motion. (March 7 transcript 1A ART p.21.)

Petitioner Bass withdrew his request for self-representation. (March 7 transcript 1ART p.24)

A time waiver was taken and trial set for April 3, 2006. (March 7 transcript 1ART p.24.)

On April 3, 2006 the case was sent to Judge Krauel for trial and petitioner Bass again made a *Marsden* motion.

Bass said that his attorney had said Bass was "nothing but a liar and a con artist." (Vol 2A *Marsden* Hearing of April 3, 2006, p. 206.)

Petitioner Bass stated again in closing, " And the comment he made to me that I'm a nobody, I'm just a liar and a con artist. I can't be represented by counsel who has that opinion of me." ( *Id.* at p. 212.)

Defense counsel responded that petitioner had "wished a brain tumor on me at some point in time so that I could be relieved off the case." Defense counsel also admitted that he did call him a con artist and a liar at that point in time. I think that was out of frustration and probably an error for me to do so, but that is truthful what he said. (*Id.* at p. 215.)

The court denied the *Marsden* motion and then petitioner asked that he be allowed to represent himself. The court responded that petitioner Bass would have to go to trial that day and there would be no continuance. Petitioner stated he was not ready to go to trial and would need a continuance. (*Id.* at pp. 221-223.)

Defense counsel asked to talk to petitioner and when they came back on the record defense counsel stated that petitioner was withdrawing his request for self-representation. Petitioner was never asked by the judge if those were his wishes but moved on to the next subject which was severance of counts 10 and 11 dealing with auto theft from the case.(2RT 224.) That completed the morning session.

At the start of the afternoon session, the judge stated he had been given a form acknowledging the right of self-representation filled out by Mr.Bass. In the process of going over the waiver of right to counsel. The judge asked petitioner:

The Court: And why are you requesting to represent yourself?
The Defendant: Mr. Tandon said I would lose with him for certain.

The Court: Do you think you would lose with another lawyer?
The Defendant: I don't think so.
The Court: And why is that?
Mr. Tandon: Your Honor, I'm going to ask that Mr. Bass not answer that question because that's getting into specifics of his case at this point.
The Defendant: Your Honor–
Mr. Tandon: That's my advice to Mr. Bass
(2RT 241.)

The judge went on to state the trial would not be delayed and accepted the "petition" to proceed in *pro per* . (2RT 242.)

Mr. Tandon put on the record that he was handing to petitioner Bass, the witness list from the D.A., the amended information, and some pages of discovery that he himself had received that morning. A recess was taken while the discovery to be given to petitioner was redacted of confidential information and copied. (2RT 243.)

Petitioner Bass then made a motion for a continuance.

The judge responded that the decision to represent himself was a result of Bass' "sour grapes" that he had not succeeded with his *Marsden* motion. He said further: "I don't see any basis for continuing this matter. You have what you have. If there are other documents, we can get them to you. There won't be any evidence presented today." (2RT 245.)

The prosecutor stated: "Well, your Honor, I think Mr. Tandon was going to provide the defendant with a copy of redacted discovery that he had received prior to today. I'll confirm that with Mr. Tandon. And if I don't hear otherwise, I'll have a copy of redacted discovery available for the defendant

tomorrow morning.(2RT 247.) The judge responded that they could pick a jury in the morning and proceed that way but the prosecutor prevailed on the judge to start jury selection immediately as she had already made arrangements for her witnesses, some of whom had been flown there. She said Mr. Bass "does not need discovery to pick a jury. And he apparently is very familiar with his case to the extent that he feels confident he can represent himself. I can have a copy of discovery for him tomorrow morning." The judge said, "I think that's the best we can do." (2RT 247.)

Mr. Bass then raised the jurisdictional issue of the charges from the Orange County bank (Comerica), moving to dismiss those charges. The judge deferred ruling on that motion and told Mr. Bass he could object when the evidence came in. (2RT 248.) The jury panel was then voir-dired and sworn in at 3:30 that afternoon. (2RT 249.)

**B. Applicable Law**

"In determining whether a denial was so arbitrary as to deny due process, the appellate court looks to the circumstances of each case and to the reasons presented for the request. [Citations.] One factor to consider is whether a continuance would be useful." (*People v. Frye*, 18 Cal.4th 894 (1998).)

It was patently unreasonable and a denial of federal Due Process to expect Mr. Bass to start his trial immediately after being granted his right to self-representation, even a lawyer would need more time.

A defendant in a state criminal trial has a constitutional right, under the 6th and 14th Amendments, to represent himself when he elects so to do. (*Faretta v. California*, 422 U.S. 806, 819 (1975) , (*Faretta*).)

"To invoke the constitutionally mandated unconditional right of self-representation a defendant in a criminal trial should make an unequivocal assertion of that right within a reasonable time prior to the commencement of

trial." (*People v. Windham*, 19 Cal.3d 121 (1977) .) When a defendant makes an untimely *Faretta* motion, the court may deny it. (See *People v. Gallego*, 52 Cal.3d 115, 163-164 (1990); *People v. Hill*, 148 Cal. App. 3d 744, 757 (1983) .) When defendant's untimely motion is brought for delay, the trial court should deny it. (*People v. Morgan*,101 Cal. App. 3d 523, 530-531 (1980) .)

There is no doubt that the trial judge could have properly denied petitioner's *Faretta* motion which was made on the heels of a denial of petitioner's *Marsden* motion on the day of trial but the trial judge granted the motion for self-representation.

Once a defendant's motion for self-representation is granted, "he must be given, if he requires it, as much time to prepare for trial as an attorney; and if a reasonable continuance is necessary for this purpose, it must be granted upon timely request. To deny him that opportunity would be to render his right to appear in *propria persona* an empty formality, and in effect deny him the right to counsel." (*People v. Maddox*, 67 Cal.2d 647, 652-653 (1967).)

It appeared that the trial judge was going to give petitioner until the following morning before the jury selection began until the prosecutor prevailed on the judge to start jury selection immediately based on the convenience of her witnesses. Her argument for immediate commencement of the trial was based on the assertion, apparently agreed with by the trial judge (2RT 247) , that discovery was not required by petitioner for jury selection. How many criminal defense attorneys would agree with that premise?

Petitioner was provided the morning after jury selection with, as stated by the prosecutor, "pages 01 through 0787; a copy of a CD, copy of the defendant's interview; and a copy of the preliminary hearing

transcript [124 pages.] And yesterday the defendant was provided with pages 788 through 798. So that is the discovery to date." (3RT 401.)

Petitioner was asked to respond by the judge and said: "I have received all of this. I haven't had a chance to look through it, but it appears to be that."(*Id.*)

After some plea negotiations and an attempt by petitioner to waive jury which was not accepted by the District Attorney's Office, he asked for a continuance. He said "I am not prepared. I just got the discovery this morning. It was just handed to me a half hour ago." The prosecutor pointed out that petitioner had said "he had been living with this particular situation for months–and it may not have been during the motion, but at some point in time yesterday morning, he said he had been living with this case for months and felt prepared to go forward." The judge denied the motion for continuance. (3RT 414-415.) Immediately following this denial, the jury waiver was accepted by the prosecution and a few minutes later the first witness was called and the taking of evidence commenced. (3RT 420.)

There is a large body of California case law following the rule set forth in *Maddox* case above, which would agree that, under these facts, reversal of all of petitioner's convictions is required.

The leading case on this issue is *People v. Fulton*, 92 Cal.App.3d 972 (1979). There, defendant Fulton's case was trailing for trial when the judge granted Fulton's motion for self-representation but appointed the former attorney to act as advisory counsel. The case again trailed after this point and when it came to trial, Fulton " sought a 30-day continuance on the ground that he had not had time, due to the lateness in getting *pro per* privileges and a copy of the preliminary transcript, to prepare for trial." (*Fulton* at pp. 975-56.) The court in reversing due to

failure to grant a continuance held:

> While it is now settled that a trial court may deny a request for self-representation made on the very eve of trial, on the ground that granting the motion would involve a continuance for preparation, the very rationale of that doctrine requires that, if the trial court, in its discretion, determines to grant the request for self-representation it must then grant a reasonable continuance for preparation by the defendant. (Citation.)

(*Fulton* at p. 976.)

Even the fact that Fulton had advisory counsel did not detract from Fulton's need for "reasonable time to prepare himself to seek or receive advice." (*Ibid.*)

In *People v. Wilkins*, 225 Cal. App. 3d 299 (1990), the defendant made a *Faretta* request on the date trial was scheduled to begin. When the defendant made his *Faretta* motion, the trial court informed him it would not grant a continuance. The court granted the self-representation request. A few days later the defendant unsuccessfully moved to continue, stating he needed time to prepare his defense and that his *in propria persona* privileges had not yet been implemented. On appeal, the court held that the denial of the continuance had violated the defendant's rights to counsel and due process, and was reversible error *per se*. It rejected arguments that the defendant had waived his right to a continuance, holding that a defendant cannot be forced to give up one constitutionally protected right to obtain another. (*Id.* at pp. 307-308.)

In *People v. Hill*, 148 Cal. App. 3d 744 (1983), over the course of several months the defendant vacillated between representation by several different attorneys and self-representation. Before the trial court granted his eventual *Faretta* motion, it informed him that it would not grant a continuance if it allowed him to represent himself. The defendant's subsequent motion for a continuance was denied. On appeal, the court

held that while the trial court could have denied the *Faretta* request as untimely, once self-representation was granted, the trial court was required to grant the defendant's request for a continuance. (*Id*. at p. 757.) It reasoned,

" 'While it is now settled that a trial court may deny a request for self-representation made on the very eve of trial, on the ground that granting the motion would involve a continuance for preparation, the very rationale of that doctrine requires that, if the trial court, in its discretion, determines to grant the request for self-representation it must then grant a reasonable continuance for preparation by the defendant. [Citation.]' . . . While the disposition of an untimely pro. per. motion is discretionary, the disposition of a request for continuance following the grant of such a motion is not . . . ." (*Ibid.*)

Petitioner Bass was forced to choose between representing himself while unprepared or proceeding with appointed counsel who admitted he called him a crook and a liar.

Bass did not get his *pro per* privileges put into the jail computer for the first four days of the trial therefore he could not make phone calls. PCC was not informed of his pro per status for four days. (7RT 1502.) He did not have a runner, he did not have an investigator, he got back to the jail too late after being in court all day to make phone calls or go to the library.(4RT 904.) He did not get a runner and an investigator appointed him until the fourth day of what was a five and one half day trial. (6RT 1407.)

He was still getting discovery from the prosecutor on the fourth day of the trial. (4RT1001-1004.) Bass was in an impossible situation.

When the trial judge allowed Bass to represent himself, and then refused a continuance to allow Bass to prepare himself for that task, Bass

was effectively denied counsel in violation of the Sixth Amendment.

## II

## PETITIONER WAS DENIED HIS STATUTORY RIGHT TO AT LEAST A FIVE DAY CONTINUANCE UNDER SECTION 1049 OF THE PENAL CODE.

Penal Code section 1049 provides: " After his plea, the defendant is entitled to at least five days to prepare for trial."

Here petitioner Bass entered his plea to the amended information on the morning of trial, April 3, 2006. (2RT 233.) Statutorily he had the right to a five day continuance under section 1049. The court could not abrogate that statutory right by conditioning the granting of *Faretta* rights on the giving up of a continuance.

A similar situation was faced by the defendant in *Wilkins*, *supra.*

There the case trailed for four of the statutory 5 days but Wilkins had no help of a runner or investigator as a pro per. The *Wilkins* court citing from *Maddox, supra,* held:

> "In short, just as a defendant may not be brought to trial too late [citations], he may also not be brought to trial too soon, i.e., without adequate opportunity for preparation of his defense. [Citations.] Implementing this rule, the Legislature has provided that 'After his plea, the defendant is entitled to at least five days to prepare for trial.' ( Pen. Code, section 1049.) A violation of this statute is not just a procedural deficiency, but an error of constitutional dimensions: 'forcing petitioner to trial in less than the minimum time provided by statute to prepare a defense, despite requests for a continuance, resulted in a denial of due process of law.' ( In re Newbern,53 Cal.2d 786, 791 (1960).

> "These principles are equally applicable to a defendant who competently elects to serve as his own attorney. It is true that such a defendant 'is not entitled either to privileges and indulgences not accorded attorneys or to privileges and indulgences not accorded defendants who are represented by counsel.' [Citation.] But neither is he entitled to less consideration than such persons. In particular he must be given, if he requires it, as much time to prepare for trial as an attorney; and if a reasonable continuance is necessary for this purpose, it must be granted upon timely request. To deny

> him that opportunity would be to render his right to appear in propria persona an empty formality, and in effect deny him the right to counsel." (67 Cal.2d at pp. 652-653.) (Italics in original.)

*Wilkins, supra,* at p. 305, 308-309.)

Here, petitioner was not given any continuance whatsoever after he received for the first time voluminous discovery in his case and was then told he would immediately finish picking a jury and hear testimony from the first witness against him . No attorney would be placed in that position, nor should he or she. A continuance of at least 30 days would be given an attorney. Petitioner had a five day continuance mandated by statute and that was denied him. The CCA (California Court of Appeal) state at pages 24-25 that the amendment to the information triggering this statutory five day continuance was so inconsequential that another statute operated to waive the five day mandatory continuance.[7] How can the CCA reasonably assert that an amendment which made it possible to prosecute the out of county charges was inconsequential and did not affect petitioner's substantial rights ? That is not a reasonable assertion by the CCA.

## III

## WHEN THE TRIAL JUDGE DEEMED THAT PETITIONER HAD RESTED AND REFUSED TO GRANT A CONTINUANCE TO ALLOW PETITIONER TO PUT ON HIS CASE, HE DENIED PETITIONER HIS SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO PUT ON A DEFENSE.

### A. Preliminary Statement

---

[7] The CCA stated: "More significantly, section 1009 states that in such circumstances, "trial . . . shall continue as if the pleading had been originally filed as amended, unless the substantial rights of the defendant would be prejudiced thereby, in which event a reasonable postponement, not longer than the ends of justice require, may be granted.'"

This issue is related to the previously set forth argument re the failure of the judge to grant a continuance after allowing petitioner to represent himself.

It is set forth separately to show just how prejudicial that denial of a continuance was since *per se* reversal tends to cover up prejudice as it does not assess it. There **was** an enormous amount of prejudice accruing to petitioner Bass due to the failure of the judge to continue the trial; in a word, he was rendered defenseless in violation of the Sixth and Fourteenth Amendments.

**B. Factual Background**

Wednesday, April 5, 2006, had Cindy Ybarra from Comerica Bank, Julian Frost of the Costa Mesa Police Department, Jeffrey Horner of the FBI and Joseph Cargel, D.A. Investigator, all testifying for the prosecution.

At the end of the day, after testifying ceased, the judge stated that Mr. Bass wanted to listen to the tape of his interview by the witness who had already testified. The prosecutor explained that the CD player had been in the courtroom that morning and she later realized it could not play the WAV[8] file on the CD of the interview. (4RT 903.) She said she had a DA laptop he could use but was "not willing to give him our laptop."

Mr. Bass had a "simple solution". He said he knew the judge was against continuances (4RT 903-04) but "If I can be given a day so that I could go to the law library that has computers that can actually play a WAV file on the computer, and I can listen to it a the law library while I'm

[8]WAV (or WAVE), short for Waveform audio format, is a Microsoft and IBM audio file format standard for storing high quality audio on PCs.(Wikipedia Internet Dictionary.)

at Central. I have not had a chance to go to the law library because I have had court for the past three days, morning all the way through the afternoon; and by the time I am done, the law library was closed. (4RT 904.) The bailiff jumped in at this point and said that 1) the CD could not be taken back to the jail and 2)there was no guaranteed computer access at the law library. The judge told Bass that the bailiff would see if the disk could "go along" in a way that Bass would have access to it. He said further that he was not against continuances but only against those continuances for which there was no "good cause" and there was no good cause for a continuance. (4RT 904-905.)

On Thursday, April 6, the fourth day of what would turn out to be a five and one half day trial, the prosecutor started the morning session saying that Mr. Bass had complained he had not received pages 123 through 126 of the discovery and she was providing him those pages that morning. She had heard there was a problem with playing the CD.

The judge answered that he had tried it in three different modes and only gotten static through the entire disk. The judge suggested it be played for Mr. Bass at the lunch hour with the DA's laptop. The prosecutor said it was a 2 hour interview and maybe Mr. Bass should listen to it first and the trial resume in the afternoon with Mr. Bass cross-examining Mr. Cargel who was the officer conducting the interview on the CD. (4RT1001-1004.)

At the afternoon session, the judge asked Mr. Bass if he was ready for cross-examination of Mr. Cargel and Bass declined. (5RT 1004.)

Bass requested a continuance to question Cargel at a later date due to information on the transcript and CD he had gleaned during the lunch-hour listening. The judge asked Bass how long he had the transcript and Bass responded, "yesterday". Bass stated there were

discrepancies between what was on the transcript and what was on the audiotape he had just heard.

The prosecutor agreed that the "transcript is not a perfect rendition of what is on the audiotape" but the transcript was not evidence and she opposed any continuance. (5RT 1005-6.)

The judge wanted to know when the transcript was first made available, not to Bass, the judge knew that had been just the day before, but to the "Defense" which meant petitioner's former attorney. The prosecutor said since December 27th 2005.

Bass responded that he made "more than half a dozen requests" from previous defense counsel for complete discovery but did not get the transcript til yesterday and the CD until today. He reiterated his need for a continuance. (5RT 1007-8.) He stated further that he needed to have an investigator assigned to him "to look into these matters" and Bass needed to "review the information and make whatever type of motions that I feel are necessary to my defense." (5RT 1008.)

The judge reminded petitioner Bass that "when we were discussing your motion to represent yourself, I told you that you had to be prepared to go forward?" The judge said he backed away from that "just a little bit" to allow him to use the courtroom to better prepare yourself to cross-examine this important witness." But that did not mean the judge was going to continue the case any further. The judge went on to state that "when you decided to represent yourself, you *stepped into the shoes of the attorney at that point with the status of the discovery was (sic) made available to you in December....*(5RT 1009 emphasis added.)

Petitioner Bass responded that he needed a continuance "so I can be assigned an investigator and runner?" The judge asked if Bass had applied to Department 11 and Bass said he had submitted a request at

the Central Jail and had yet to get a response. Bass also requested that the subpoenas he had filled out be submitted. (5RT 1010.)

Bass again asked for a continuance and an investigator and runner to help him file appropriate motions. He specifically mentioned a motion for illegal search and seizure of the contents of the vehicle. (5RT 1054-55.)

Bass again stated he wanted a hearing on suppression but he again was met with the untimeliness of that motion. (5RT 1059-60.) Earlier he had asked for a continuance so he could file a motion to suppress. (4RT 889.)

The judge, on late Thursday, approved five of petitioner's subpoenas (5RT 1096) and then, with the authority conferred upon him by Department 11, appointed an investigator and runner to assist Mr. Bass. (5RT 1098.) The judge said it was his intention to put the case over until the following Wednesday morning as to Counts 1 through 10 and commence the following day, Friday, with the severed counts dealing with car theft and receiving stolen property. (5RT 1103-1104.)

The prosecutor was to commence her case Friday morning and the judge told petitioner to have his witness relating to *that* trial to be contacted and ready. Mr. Bass responded: "the problem is, your Honor, by the time I get back to–The court: Mr Bass, I understand the problems. I understand this is going to be very difficult to do....We are in this circumstance...as a consequence of becoming your own lawyer at the beginning of this trial, which was Monday, we're in the circumstances we are in. Do the best you can." (5RT1105.) Bass stated " I need to have a continuance, And I am not trying to delay the trial or delay this case or prolong anything out." (5RT 1106.)

The request was denied, the car theft part of the trial commenced

on Friday, the next morning at 9:00 a.m. (Id.)

At the end of the prosecution's case on Friday, as to Counts 11 and 12, car theft and receiving stolen property, the judge asked petitioner if he were going to testify. Bass responded that he had just spoken to the investigator "today" and he needed to get a continuance. The judge said theat he would hear the motion to continue at 1:30. (6RT 1394.)

In the afternoon session, petitioner asked for a one week continuance "until the subpoenas have been issued for the witnesses for this particular case have been served and I can get notified from the investigator that they will appear." (6RT 1394-95.)

The judge denied the motion to continue. (6RT 1399.)

The prosecutor rested.

The judge turned to petitioner to "look at the motions on file." Mr. Bass stated:

> Well, I haven't had a chance to prepare motions because I was just assigned the investigator, and I haven't met the PCC runner to obtain the proper documents to file those motions. And that's why I wanted to have a continuance, to prepare those motions and present them to the court in legal format, and I haven't had a chance to do that. I have been at court every day from the morning to the afternoon, and I just discovered yesterday that information was not entered into the computer that I was pro per. My status was not pro per and I just learned that yesterday. So I have been denied access to any documentation, any information since I have come to trial.

(6RT 1407.)

Bass again pointed out that his status as a pro per was not in the jail computer system and he could make no calls or get pro per privileges. The judge responded to take it up with Department 11 and Bass answered he had no way to contact Department 11. The judge said that he had the services of an investigator and runner and Bass responded he

only had the investigator's business card but could not telephone him as he had no access to a phone. The judge told petitioner that the trial was finished with respect to Counts 11 and 12 and for petitioner to be ready to put on his defense to Counts one through ten on Wednesday afternoon. (6RT 1420.)

On Wednesday afternoon, petitioner said he had not heard from his investigator who took the subpoenas petitioner had drafted and he was unaware of a"any witnesses that may be made available today to appear in court on the defense's behalf. Bass said that he had prepared a request for continuance because of the "short notice". Petitioner Bass stated that the court gave him permission to proceed in *pro per* on Monday, April 3, 2006 but "it did not become effective until Thursday April 7th of 2006. So PCC that was assigned to defense counsel just was not made aware that I needed assistance." Petitioner also pointed out that under the "criminal code in issuing subpoenas, witnesses need anywhere between five and seven days to answer to a subpoena or basically state if they are going to show up or not." (7RT 1502.)

The prosecutor opposed any continuance because of "the fact that defendant has decided at the late stage to represent himself has put himself in his own predicament." (7RT 1504.) The motion to continue was denied. (7RT 1507.)

When asked to take the stand, Mr. Bass said he could not "at this moment" as there were not witnesses in the courtroom for whom he had issued subpoenas. He said he only had Monday and Tuesday to get his witnesses subpoenaed for Wednesday and that was not enough time. (7RT 1509.)

When told he was not presenting a case, petitioner said he would present a case with witnesses.(7RT 1511.) He said if there was not going

to be a continuance he was moving for dismissal. (7RT 1512.)

Then the following occurred:

> The Court: Court deems that the defense has rested.
> Mr. Bass: No.
> The Court: People, any rebuttal?
> Ms. Khalil: No, your Honor.
> Mr. Bass: Your Honor, the defense does not rest.
> .............
>
> The Court: The defense case is deemed completed.

(7RT 1513.)

**C. Applicable Law**

The Sixth Amendment is the basis of the right to present a defense: Rights of the accused.

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

What happened in this case was a total deprivation of petitioner's right to put on a defense in contravention of the Sixth and Fourteenth Amendments of the United States Constitution and Article !, section 28, subdivision (d) of the California Constitution. [the State constitutional right to present all relevant evidence].

This writer could find no case remotely approaching this fact situation where a trial judge, in a court trial, refused to allow time for an in-custody defendant to properly prepare his case, and forced him to rest without presenting a defense.

In *Crane v. Kentucky*, 476 U.S. 683 (1986) , (*Crane*), a defendant was precluded from introducing any testimony about the physical and

psychological environment in which his confession had been obtained, in order to prove the confession was unreliable. The Crane court concluded that the blanket exclusion of the proffered testimony about the circumstances of petitioner's confession deprived him of a fair trial.

In the instant case, the exclusion of the defense case was total due to the fact that petitioner was not able to even have his subpoenas served on his witnesses because he was given no time to do so by the trial judge.

The Supreme Court of California stated recently:

> It is certainly true that a defendant who is representing himself or herself may not be placed in the position of presenting a defense without access to a telephone, law library, runner, investigator, advisory counsel, or any means of developing a defense [citation], but this general proposition does not dictate the resources that must be available to defendants."

(*People v. Jenkins*,22 Cal.4th 900 at p. 1040 (2000) .)

Yet, this is *exactly* the position petitioner Bass was placed in for the first five days of a five and one half day trial. He had no telephone access, no library privileges, no runner, no investigator and he was in trial all day everyday from Monday through Friday of those five days.

He could not file pre-trial motions to suppress evidence of the search of his car or to demur to the Comerica counts (nine and ten) on the basis of improper venue. Petitioner was deprived of his right to present a defense due to the rush to judgment which followed once his *Faretta* rights were granted.

## IV

## SINCE THE COURT OF APPEAL DECISION INVOLVED AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED SUPREME COURT LAW AND, IN ADDITION, WAS BASED ON AN UNREASONABLE DETERMINATION OF THE FACTS, THAT DECISION IS NOT ENTITLED TO DEFERENCE BY THIS FEDERAL COURT. THE AEDPA IS NO BAR TO THE GRANTING OF THIS PETITION.

### A. THE PETITION SHOULD BE GRANTED UNDER THE AEDPA.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. section 2254, defines the standard of review in this case.

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgement of State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

28 U.S. C. section 2254(d)(1)

In *Taylor v. Maddox,* 366 F.3d 992,999 (9th Cir. 2004), the Ninth Circuit established a two part analysis under sections 2254(d)(2) and (e)(1). Under *Maddox,* federal courts must undertake an "intrinsic review" of the state court's fact finding under the "unreasonable determination" clause of section 2254(d)(2) . (*Maddox* at p.1000.)

The *Maddox* court held that this intrinsic review requires federal courts to examine the fact-finding *process* not its findings. That court went

on to state that “intrinsic challenges to state court findings pursuant to the ‘unreasonable determination’ standard comes in several flavors, each presenting its own peculiar set of considerations.” The court listed, for example “ where the state court should have made a finding of fact but neglected to do so.[;]...where the state court does make factual findings , but does so under a misapprehension as to the correct legal standard [;]...and, where the fact finding process is itself defective” . (Maddox, supra, at 1000-01.) “Once the state court’s fact-finding process survives this intrinsic review-or in those cases where petitioner does not raise a challenge to the intrinsic facts as found by the state court-the state court’s findings are dressed in a presumption of correctness,” (28 U.S.C. 2254 (e)(1); *Maddox . supra,* at p. 1000.)

**B. The State Appellate Opinion Upholding Petitioner’s Convictions In the Face of Clear Violation of Petitioner’s Right to A Continuance to Prepare for Trial, Was Based Both on Unreasonable Application Of, Clearly Established Federal Law, as Determined by the Supreme Court of the United States And On an Unreasonable Determination of the Facts.**

1. **Applicable Law**

**a. The Law of the Supreme Court of the United States re Continuances**

"The matter of a continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. . . . Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality. . . . There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the

circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S. Ct. 841, 11 L. Ed. 2d 921 (1964) (citations omitted); see also *Morris v. Slappy*, 461 U.S. 1, 11-12, 103 S. Ct. 1610, 75 L. Ed. 2d 610 (1983) ("broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to assistance of counsel").

In considering whether the denial of a continuance implicating a defendant's right to counsel is an abuse of discretion, the Ninth Circuit has applied these factors: (1) whether the continuance would inconvenience witnesses, the court, counsel, or the litigants; (2) whether other continuances have been granted; (3) whether legitimate reasons exist for the delay; (4) whether the delay is the defendant's fault; and (5) whether a denial would prejudice the defendant. See *United States v. Mejia*, 69 F.3d 309, 314 n.5 (9th Cir. 1995) (citing *United States v. Robinson*, 967 F.2d 287, 291 (9th Cir. 1992)); see also *United States v. Garrett,* 179 F.3d 1143, 1145-47 (9th Cir. 1999) (en banc).

If ever there was a "myopic insistence upon expeditiousness in the face of a justifiable request for delay", this is it. Petitioner waived jury so there was no jury waiting. The prosecutor's witnesses were all local. Petitioner was essentially helpless to defend against the charges in the short time he had and in view of the error in getting his pro per status into the jail computer.

**b.) The CCA Was Unreasonable In It's Application and Interpretation of State Law re Granting Self-representation But then Denying A Continuance.**

The CCA improperly relied on a Supreme Court of California opinion in *People v. Valdez,* 32 Cal.4th 73 (2004) , to hold that it was not a denial

of due process or abuse of discretion to grant *pro per* status and then refuse a continuance to a defendant. The point is that the defendant in *Valdez* did not take the trial court up on his offer of *pro per* status without a continuance so *Valdez* is not authority at all for the court of appeal's holding.

The Supreme Court in *dicta* in *Valdez* hypothesized that a trial judge *could* grant a *Faretta* request and deny a continuance if in fact the judge was able to make a finding that the *Faretta* request was only a tactic made for purposes of delay. (*Valdez* at p. 103.)

Here the trial judge never did make such a finding and couldn't have. The case had proceeded expeditiously from arrest on December 14, 2005 to a trial date of April 2006. (This point was made in the Respondent's Brief at page 8 in the proceedings below) . Petitioner had just been handed almost 800 pages of discovery the second morning of a five and one half day trial. There was no way any judge could have made a finding that a *Faretta* request was made for purposes of delay when petitioner had very good reasons for wanting to represent himself , articulated in the two failed *Marsden* requests, which did not include delay.

Nonetheless the judge denied the *Marsden* motion despite the obvious conflict between petitioner and his attorney and, having no other choice, petitioner asked to represent himself. The judge said if he did allow that, petitioner would have to go to trial that day. Petitioner said he was not ready to go to trial and would need a continuance. (*Id.* at 221-223.) This was no delaying tactic but a desperate move to avoid putting your life in the hands of one who told you to take a "deal" when that attorney had not even received the discovery. (March 7 RT p. 21.)

The CCA at pages 12 and 13 relies on the capital cases of *People*

*v. Clark*, 3 Cal.4th 41 (1992) (*Clark*) and *People v. Jenkins* , 22 Cal.4th 900 (2000) (*Jenkins*) for the proposition that a trial court has discretion to allow a defendant to represent himself on the condition that if the request is granted, there will be no delay in the proceedings.

The are major factual differences between *Jenkins* and *Clark* and the instant case which render them inapposite. The Supreme Court pointed those differences out in *Jenkins below*:

> In *People v. Bigelow*, 37 Cal. 3d 731 (1984), this court in dictum stated that the defendant "could not reasonably be expected to proceed to trial without any time for preparation, and that if the trial court did not intend to deny the motion for self-representation as untimely . . . it should have considered granting a continuance." ( *Id.* at p. 741, fn. 3.) We cited an earlier Court of Appeal opinion characterizing failure to provide an adequate continuance in these circumstances as a denial of due process of law. (*Ibid*.) We observed in *People v. Clark*, *supra,* 3 Cal. 4th 41, that "a necessary continuance must be granted if a motion for self-representation is granted." ( *Id*. at p. 110.) On the other hand, in the *Clark* case we also stated that "it also is established that a midtrial *Faretta* motion may be denied on the ground that delay or a continuance would be required," and sanctioned the trial court's decision to condition the granting of the right of self-representation on defendant's waiver of a continuance. (*Ibid*.) In the present case, in ruling on defendant's midtrial motion to represent himself, the court correctly noted that it had authority to deny the motion if self-representation required a continuance, and, in advising the defendant of the perils of self-representation, it asked defendant whether he understood, among other things, that he would receive "no extra time for preparation." Defendant indicated he understood. In addition, when defendant secured permission to proceed *pro se*, the court already had denied counsel's request for a continuance for further investigation and preparation for the penalty phase of the trial. Defendant was no more entitled to a continuance when he became his own counsel than he was entitled to a continuance at former counsel's request. This was especially true when, as in the present case, defendant "***had been afforded research facilities for many months, so that he had a full opportunity to prepare independently for trial even while he was represented by counsel.***" ( *People v. Clark*, *supra*, 3 Cal. 4th at pp. 110-111.) ***Indeed, defendant not only had access to research facilities, but asserted that he had known all along that if there were a penalty phase of the trial, he would conduct it, and that he had contacted his witnesses and was ready to proceed.***

(*Jenkins, supra* at pp. 1038-39, emphasis added.)

The above lengthy but necessary quote shows just how inapplicable *Jenkins* and *Clark* are to this case. This was no mid-trial *Faretta* request and petitioner did not have a chance to prepare at all and had no resources. Petitioner received 787 pages of discovery, a CD of a recorded interview (petitioner later complained he had no way to play the CD) and a copy of the preliminary hearing *the morning after he was granted pro per status*!

No, the cases cited in *Jenkins*, *Bigelow* and *Clark,* quoted above are correct when they say granting a *pro per* request and denying a continuance is unreasonable and likely a denial of Due Process absent the special situation of *Jenkins* and *Clark.*

The court's opinion never discusses the nightmare faced by petitioner. Petitioner Bass was forced to choose between representing himself while unprepared or proceeding with appointed counsel who disliked him intensely and told him to plead without even receiving discovery from the prosecutor.

Bass did not get his *pro per* privileges put into the jail computer for the first four days of the trial therefore he could not make phone calls. PCC was not informed of his pro per status for four days. (7RT 1502.) He did not have a runner, he did not have an investigator, he got back to the jail too late after being in court all day to make phone calls or go to the library.(4RT 904.) He did not get a runner and an investigator appointed him until the fourth day of what was a five and one half day trial. (6RT 1407.)

He was still getting discovery from the prosecutor on the fourth day of the trial. (4RT1001-1004.) Bass was truly in an impossible situation, he was between a rock and hard place and the judge delivered the *coup de*

*grace* by refusing a continuance after granting *pro per* status.

When the trial judge allowed Bass to represent himself, and then refused a continuance to allow Bass to prepare himself for that task, Bass was denied Due Process of law.

This court should grant this petition and reverse the decision below.

**c.) Penal Code section 1049 Gave Petitioner a State Created Right to a Five Day Continuance Which Was Arbitrarily Denied By the Trial Court and Thereby Deprived Petitioner of Due Process**

The arbitrary deprivation of petitioner's entitlement to a five day continuance after the amendment of the information to allow the out of county charges violated the Due Process Clause of the Fourteenth Amendment. *Hicks v. Oklahoma,* 447 U.S. 343 (1980).

In the CCA opinion, the court relied on the case of *People v. Valdez* 32 Cal. 4th 73 to wipe out petitioner's expectation of having the benefit of section 1049 to give him a five day continuance after amendment of the information.[9] *Valdez* did no such thing. Petitioner had a "substantial and legitimate expectation that he would receive a that five day continuance as a minimum and therefore his federal due process rights were implicated. *Hicks v. Oklahoma*, *supra,* at 346-47, (granting habeas relief because the state court violated petitioner's "substantial and legitimate expectation" to a jury sentence and made a "wholly incorrect" finding that

[9] In footnote 13, the CCA disposed of petitoner's reliance on section 1049 as intrepreted by *People v. Wilkins, supra,* 225 Cal. App. 3d 299 ,in the following manner: "The case Bass relies on in his argument, *Wilkins,* supra, 225 Cal.App.3d 299, 308, is unavailing, as that case relies on the principle that a grant of an untimely Faretta motion requires the granting of a continuance. As noted in part I.B., ante, this principle has been modified by more recent pronouncements of our Supreme Court."

the error was harmless). Because the California Court of Appeal's application of section 1049 violated it's own state court interpretation of that statute as set forth in *Wilkins*, *supra,* it was arbitrary, and was not "contrary to" or "an unreasonable application of" *Hicks*. The petition should be granted on this ground alone.

**2.The Court of Appeal Opinion Set Forth An Unreasonable Determination Of The Facts In Light Of The Evidence Presented At Trial.**

The state court's fact-finding process in this case suffered from the same infirmities that the Ninth Circuit identified in *Taylor v. Maddox*, *supra* where the state court's "failure to consider, or even acknowledge . . . highly probative testimony cast[] serious doubt on the state-court fact-finding process and compelled the conclusion that the state-court decisions were based on an unreasonable determination of the facts." 366 F.3d 992, 1005 (9th Cir.), cert. denied, 125 S. Ct. 809 (2004). In *Taylor*, the state court failed to consider a witness's probative and corroborating testimony that the petitioner, a minor, had repeatedly asked to speak with a lawyer and with his mother after being arrested in the middle of the night and interrogated without break until three o'clock in the morning. Whereas the minor's testimony was "clear, direct, consistent, and unequivocal," *id*. at 1013, the conflicting testimony of the officer was "ambiguous," *id*. at 1010-12, "inherently incomplete and somewhat confused," id. at 1013. Analogous circumstances exist in this case in the unreasonable determination of the facts of the CCA opinion as set forth below:

1. Petitioner pointed out at p. 5 of the Petitioner's Opening Brief (AOB) that after he was given his right to represent himself and his motion to continue was denied, he told the judge he had no discovery. The judge accepted this fact but told petitioner he did not need discovery to pick a

jury. The court's opinion at page 8, states that petitioner said he had "100 days" to review his case when he was being examined in order to represent himself. What the court's opinion leaves out is that this statement was made before petitioner knew he was going to be handed, the day after the trial started, the following:

> "pages 01 through 0787; a copy of a CD, copy of the defendant's interview; and a copy of the preliminary hearing transcript [124 pages.] And yesterday the defendant was provided with pages 788 through 798. So that is the discovery to date." (3RT 401.)
>
> Petitioner was asked to respond by the judge and said: "I have received all of this. I haven't had a chance to look through it, but it appears to be that."(*Id.*)

On the second day of the five day trial, petitioner said "I am not prepared. I just got the discovery this morning. It was just handed to me a half hour ago." The prosecutor pointed out that petitioner had said "he had been living with this particular situation for months–and it may not have been during the motion, but at some point in time yesterday morning, he said he had been living with this case for months and felt prepared to go forward." The judge denied the motion for continuance. (3RT 414-415.) Immediately following this denial, the jury waiver was accepted by the prosecution and a few minutes later the first witness was called and the taking of evidence commenced. (3RT 420.) All this discovery handed to petitioner was mid-trial . The Court's opinion is silent on this fact.

2. The opinion of the CCA did not mention that petitioner told the judge that the fact that he was a *pro per* was not put into the jail computer for the first four days of his trial therefore he could not make phone calls and that PCC was not informed of his *pro per status* for the first four days of the trial. (7RT1501-02.) During that time petitioner did not have a

runner, he did not have an investigator, he got back to the jail too late after being in court all day to make phone calls or go to the library. (4RT904.)

3) The opinion of the CCA does not mention that petitioner did not get a runner and an investigator appointed to him until the fourth day of what was a five and one half day trial. (6RT1407.) This, despite the fact when the *Lopez* waiver was taken, allowing him to represent himself, petitioner was promised a runner and an investigator. (2RT238.)

4) The court's opinion erroneously states at page 12[10] that the trial was delayed for a week "to accommodate Bass's efforts to subpoena defense witnesses." That did not happen. The actual facts are that the trial ended Friday evening and recommenced on Wednesday at 1:30. Petitioner then made a motion for continuance as there was insufficient time for petitioner's investigator to subpoena witnesses. (AOB7.) The court then proceeded **that very same day,** Wednesday April 12, 2006, to find petitioner guilty of all charges and set a sentencing date. Petitioner was given Monday and Tuesday after an investigator was appointed on the previous Thursday evening, there was no week delay of the trial.

Accordingly, "the fact-finding process is itself defective" under *Maddox, supra.* The CCA is owed not presumption of correctness in view of these major mistakes which were relied upon in the CCA decision denying relief to petitioner.

---

[10]The pagination of the CCA opinion is that in the Lexis version attached to this Memorandum as Exhibit "A".

**3. The Error Was Reversible *Per Se***

*People v. Wilkins, supra,* clearly holds at pp. 307-308, that a denial of a continuance under similar circumstances, granting *Faretta* rights with no continuance to prepare, is structural error and reversible *per se.*

A structural defect is the type of error "affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself," one that " 'transcends the criminal process' " and "def[ies] analysis by 'harmless-error' standards." ( *Arizona v. Fulminante*, 499 U.S. 279 (1991) at pp. 309-311 [113 L. Ed. 2d at pp. 330-332].)

There is no manner in which this error can be quantitatively assessed, it affected the entire structure of the trial. Granting of the petition is required.

**4. In the Alternative, The Petition Must Be Granted Under These Circumstances As There is Grave Doubt the Error Was Harmless**

If a habeas court is left with 'grave doubt' about whether a constitutional error substantially influenced the verdict, then the error was not harmless." *Parle v. Runnels*, 387 F.3d 1030, 1044 (9th Cir. 2004) (citing *O'Neal v. McAninch*, 513 U.S. 432, 438, 115 S. Ct. 992, 130 L. Ed. 2d 947 (1995)).

**CONCLUSION**

As Judge Wyzanski has written: "While a criminal trial is not a game in which the participants are expected to enter the ring with a near match in skills, neither is it a sacrifice of unarmed prisoners to gladiators." (*United States v. Cronic* (1984) 466 U.S. 648,656-657.)

Mr. Bass, with first-time receipt of voluminous discovery, without a

runner, without an investigator, without phone privileges, in custody and representing himself without a continuance after the granting of his *pro per* status, was indeed an unarmed prisoner in the ring with gladiators. Appellant was denied Due Process under the Fourteenth Amendment.

This Petition for Habeas Corpus should be granted and result in a reversal.

Respectfully submitted,

Charles R. Khoury Jr.
Attorney for Petitioner Bass

DATED:08/04/08 S/Charles R. Khoury Jr.
Attorney for Petitioner BASS